On September 30, 1922, Dan Hogan executed a will, in which he gave his property, in certain proportions, to the children of L. W. Chance, Miss Bessie Elliott, and an aunt of the testator, Miss Nora Moran. Thereafter on November 9, 1923, he made another will in which he gave his property to the children of appellant, J. H. Payne, Miss Margaret Elliott, and Miss Nora Moran. Testator died April 20, 1924.
On the 23d of April, 1924, the appellant filed his application to have the last-mentioned will probated. On November 18, 1925, the appellee filed an answer contesting the probate of said will on two grounds, namely: (1) Lack of testamentary capacity; and (2) undue influence. On the same day, the county court admitted the will to probate. From this order, Chance appealed to the district court, and on March 14, 1927, the case was tried in that court to a jury.
Two issues were submitted to the jury. The first, with the finding, is, in effect, that at the time Dan Hogan signed the last will, *Page 329 
dated November 9, 1923, he did not have testamentary capacity. The second issue, which related to the question of undue influence, was not answered. Based upon the verdict, the court denied appellant's prayer for the probate of the will. From a judgment entered in accordance with the verdict, this appeal is prosecuted.
The sole issue before us is that of the testamentary capacity of Dan Hogan at the time he executed the last will. There is no issue of insanity of any character, senility, or undue influence in the case. It is insisted by appellant: (1) That there is no evidence to support the jury's finding; (2) that the great preponderance and overwhelming weight of the evidence is that the testator had sufficient mental capacity to make a valid will at the time he executed it on November 9, 1923, and that the undisputed evidence in behalf of the proponent showed that testator was more than 21 years of age, was of sound mind, and executed the will with all the formalities and solemnities required by law. These contentions require us to review the statement of facts and the evidence relevant to the issue to be decided. In determining the issue presented by this appeal, there are certain fundamental principles of law and procedure which govern in such cases and which may be stated as follows:
The question of testamentary capacity is ordinarily one of fact for the jury. Rienhardt v. Nehring (Tex.Civ.App.) 283 S.W. 347; 1 Alexander on Wills, p. 548, § 403.
It is held that a testator is capacitated if he knows the nature of the business or transaction in which he is engaged, the extent of his property, and the persons who are the objects of his bounty. Vance v. Upson, 66 Tex. 476, 1 S.W. 179; In re Bartels' Estate (Tex.Civ.App.)164 S.W. 859; Prather v. McClelland, 76 Tex. 574, 13 S.W. 543; Morris v. Morris (Tex.Com.App.) 279 S.W. 806.
Ordinarily less capacity is requisite to enable a testator to make a valid will than for the same person to enter into a contract or engage in intricate and complex business matters and transactions. Vance v. Upson, supra; 1 Alexander on Wills, p. 444. The testator's mental capacity must be determined as of the date of the will. Vance v. Upson, supra; Warren v. Ellis (Tex.Civ.App.) 137 S.W. 1182; 1 Alexander on Wills, p. 435.
While the tendency of the courts is to uphold wills (1 Schouler on Wills [6th Ed.] § 200), the rule in Texas is that the burden is on the proponent to show by positive evidence, at the time he seeks to have the will probated, that the testator was possessed of mental capacity at the time the will was executed, sufficient to make a valid will.
Upon the issue involved, about 25 witnesses testified pro and con. It was shown that the testator was an old bachelor about 55 years of age, a native of Ireland, and had lived at Ralls and in that vicinity for about 20 years. He was a painter by trade, had been a cowboy in earlier days, and at about the time of his death owned a wagon yard and had been running a small restaurant. When he first came to Ralls, it appears that he was taken into the home of L. W. Chance, the contestant, where he was treated practically as a member of the family. During this period, he executed the first will. Later he moved into a small house in his wagon yard and lived there until his death. It is conceded that he was an habitual drunkard, and at times would become so intoxicated that he was not mentally or physically able to attend to his business. The contestant insists that at the time the last will was executed, he was intoxicated and that he had been so weakened mentally by heavy drinking prior to that date that he was not capable of making a valid will.
Proof of habitual intoxication raises no presumption that incapacitating drunkenness existed at the time the will was executed. 1 Schouler on Wills (6th Ed.) § 214.
As said in 1 Alexander on Wills, § 475:
"A person may drink and yet retain his mental faculties, although some may claim they are blurred to an extent, yet the use of intoxicants does not necessarily mean a complete loss of understanding. The same may be said regarding drugs, yet without question, a person, through a superabundance of alcoholic drinks or the excessive use of drugs, may become so mentally obscured that he is, for the time being, comparable to a mad man. In such a condition, he cannot make a valid will, for understanding is lacking, but the effects of alcohol and of drugs wear off and although they may leave the user weakened, both in mind and in body, yet so long as there has not been a destruction of that mentality which the law requires for the making of a will, it cannot be said that the fact that the testator is addicted to the habit of drinking or of drugs incapacitates him from making a will. Such fact alone does not raise a presumption that the necessary intelligence is lacking. The question to be determined is the mental capacity of the testator at the time he makes his will and the fact that he may be then under the influence of liquor does not invalidate his testament unless he had no intelligent comprehension of what he was doing, and the effect of the intoxication on his capacity is not a question for experts but depends upon common observation and the facts of the particular case."
Upon the issue of Hogan's mental capacity, as affected by his habits of intoxication, four witnesses for the proponent and one for the contestant testified as to such condition on November 9th, when the last will was executed. The statement of facts is voluminous, comprising over 100 pages, and we will merely give a summary of such testimony from the various witnesses, bearing upon this issue.
It appears that on the morning of the 9th of November, the testator, with Payne, concluded to go to Crosbyton, but they were *Page 330 
prevented from leaving Rails until about noon. About that hour they left Rails and went to Crosbyton, the county seat, 8 or 10 miles distant. Upon arrival at Crosbyton, the testator went immediately to the office of Mr. Green Harrison, the county attorney, who had been his legal adviser for a number of years, and stated that he wanted Harrison to draft his will. He gave Harrison a statement of what disposition he desired to make of his property as well as a statement of the property, including several town lots in Ralls. The county attorney wrote the will and it was attested by the County Judge Jake Made, and the sheriff, John D. McDermett. These three witnesses testified that they had known the testator for a number of years and that at that time he was in his usual frame of mind and was not intoxicated. The fourth witness, V. R. Plummer, an abstractor, had an office in the courthouse, and while the testator was in the courthouse, he called on Plummer and they had a settlement of some business transactions. It seems that testator had been doing some painting for Plummer and Plummer had been doing the testator's abstract work, and in a settlement Plummer gave Hogan a check for a balance due the latter. Plummer testified that Hogan handled the transaction in a business-like way, and that he observed nothing out of the ordinary in Hogan's mental condition. Harrison testified that he thought Hogan's mind was sound; that he did not smell whisky and did not think Hogan was drunk at the time the will was signed. He stated affirmatively that in his opinion Hogan was sober.
Sheriff McDermett testified that he had known Hogan for years and years, his acquaintance beginning in a cow camp when Crosby county was only a cattle ranch. He testified that from the conversation he had with him that he thought Hogan's mind at the time he executed the will was all right.
Judge Made was not so positive in his testimony because he explained that he merely attested the will at Hogan's request and did not observe him critically. He had known Hogan for only two or three years, but he stated that there was nothing about Hogan's conversation or manner as attracted his attention specially or caused him to think or believe that there was anything out of the ordinary or unusual in Hogan's condition; that his conduct was as a business man while there.
Plummer stated that his business relations commenced with Hogan in 1917 or 1918; that based on his transactions with Hogan on the day the will was signed, judging from his conduct and appearance, physical as well as mental, in his opinion Hogan was sober.
Several witnesses testified that after knowing Hogan intimately for years, in their opinion, when Hogan was sober, he was at himself mentally as much as any other man. The consensus of the opinion of practically all of the witnesses for both sides was that he had good business judgment and clear ideas, especially concerning his own affairs, when he was not intoxicated.
Several witnesses for the contestant admitted that when Hogan was on a spree he would not attempt to transact any business. The effect of their testimony is to show that he realized while he was under the influence of liquor that he was incapable of attending to his business affairs, even in the issuing of checks, and would refer parties who called upon him to transact business matters to L. W. Chance.
His banker testified that he told him at one time during a protracted spree not to pay any checks of his which had not been O. K.'d by L. W. Chance. It would seem that the effect of this testimony is to rebut the contestant's position that Hogan would undertake to dictate and execute a will while intoxicated.
Will Ezell is the principal witness introduced by contestant to sustain the contention that Hogan was intoxicated on the day the last will was executed. It seems reasonably clear that Ezell was mistaken as to the date. The testimony is uncontradicted that the will was executed early in the afternoon of November 9th. According to Ezell's testimony, in which he details an all-day orgy with Hogan, he says he was drunk with Hogan in Crosbyton on November 9th. He says he met Hogan about 8 o'clock in the morning. He did not express an opinion as to Hogan's mental capacity, but described his condition as "shaking," "nerves all torn up," and in "pretty had shape." Ezell admitted that he was a "jake" and "extract" drinker himself; that he had been drinking "that stuff about as strong as anybody for a number of years"; and that at times he was "almost crazy." His testimony shows that together with Hogan and a third party by the name of Andy Wooten, who was not introduced as a witness, they purchased between 10 and 15 bottles of vanilla extract and Jamaica ginger, retired behind a signboard, and drank it, most of which was consumed in the forenoon. The reasonable inference from Ezell's testimony is that this drunken spree was on a date other than November 9th.
The only other witness, whose testimony in behalf of the contestant tends even remotely to show Hogan's condition on the day in question, is the witness Williamson, who says that he was in the transfer business at Ralls and hauled some shoes from the depot to Hogan's place of business either on the 8th or 9th of November, 1923, and that Hogan was drunk the day he hauled the shoes. He further says that Hogan was drunk on both days. It is difficult to understand how Hogan *Page 331 
could be drunk in Ralls for two days and during one of such days get on a drunk with Ezell in Crosbyton.
One important witness for the contestant was Dr. Fullbright, who testified as an expert upon testator's mental and physical condition; but there is considerable doubt, from his testimony, as to the period when he was Hogan's medical adviser. It appears, according to his statement, that he visited Hogan while the latter was in jail in Crosbyton charged with drunkenness in March, 1923, and until about a week before testator died in April, 1924. He finally said:
"When he was in jail here, I saw him a few days before he was down here, and I think I saw him a few days professionally afterward."
The doctor testified that Hogan bad Bright's disease, which had affected his heart and rendered him dropsical, resulting in a swelling of his lower limbs. He gave it as his professional opinion that Bright's disease would, in certain cases, result in oedema of the brain, but he did not state that Hogan was in such condition. On recross-examination, he said:
"I would not want to leave the impression with the jury that a man, though crippled and diseased in the limbs, that his mind is affected to such an extent that he would not know what to do with his property or how he wanted to give it away or how he wanted to dispose of it by will. I would not say a man of old age or a man who drank would not still have enough mind to know to whom he wanted to give his property."
The testimony of the witnesses not herein specifically mentioned all tend to show that Hogan was a heavy drinker and was frequently, intoxicated to such an extent that he did not attempt to conduct his business affairs, which consisted in part of an army store and a small restaurant and cafe. It is conceded that when he was not in a drunken condition he was a man of more than ordinary intelligence and above the average in mentality. He head the daily papers and was well informed in public affairs. He was a member of the Knights of Columbus, a Catholic in religious belief, a Republican in principle but voted the Democratic ticket in Texas, and during the struggle between Ireland and England was a strong partisan of his native Isle. He was bitterly opposed to the Ku Klux Klan and freely and intelligently discussed all such issues with his friends. Aside from the opinion of Dr. Fullbright and possibly one or two other witnesses, there is nothing to indicate that his mind had become so enfeebled by his use of intoxicating liquors that he could not efficiently conduct his business affairs when not on one of his sprees, and the testimony, taken as a whole, does not indicate that when ordinarily sober he would be mentally incapacitated to dispose of his property by will.
Considerable testimony was introduced showing that he had stated, both before and after the execution of the last will, to whom he expected to give his property and to whom it had been devised. This, with other testimony of declarations, which, in effect, contradicted the provisions of the will, was admissible only for the purpose of showing his mental capacity and should have been limited by the court to that purpose.
Because we are convinced that the verdict of the jury, as to the testator's mental capacity, is contrary to the preponderance of the testimony, the judgment is reversed and the cause is remanded.