## ELLISON v. ELLISON et al.
### No. 14413.

Court of Civil Appeals of Texas. Fort Worth.

Sept. 4, 1942.

Rehearing Denied Oct. 9, 1942.

Van Zandt Smith, of Fort Worth, for appellant.

Cantey, Hanger, McMahon, McKnight & Johnson and Bryan, Stone, Wade & Agerton, all of Fort Worth, for appellees.

SPEER, Justice.

This is an action for the construction of the will of Robert A. Ellison, Sr., deceased, instituted by Fort Worth National Bank, as trustee, naming Margaret M. Ellison and Robert A. Ellison, Jr., beneficiaries under the will, as defendants.

Robert A. Ellison, Jr., was shown to be a minor, and the court timely appointed a guardian ad litem to represent his interest.

We shall refer to the Fort Worth National Bank as trustee, Mrs. Margaret M. Ellison as the wife, and to Robert A. Ellison, Jr., as the minor, or as the child.

The will under consideration was wholly written by the testator. He died in November, 1933, the will was duly probated, the bank was named as independent executor and after the estate was administered by it, the bank thereafter acted and is at this time trustee under the terms of the will.

We will not attempt to quote the whole of the lengthy document, in which the testator disposed of his large estate, consisting of approximately a half million dollars in property, but omitting formal parts, those essential to this appeal are as follows:

"I appoint the Ft. Worth National Bank as Trustee, to handle all properties in my name or to which I have or will fall heir for the benefit of my son, Robert A. Ellison, Jr. I give the Ft. W. Nat. Bank, as executor of this will and of my estate, full power and authority to sell and convey, for such consideration and on such terms as they may determine, any item or items of property at any time constituting a part of the corpus of my Estate or trust. They shall keep the principal invested and re-invested in good sound bonds and/or other securities, including promissory notes or other evidence of debt, well secured by personal collateral or by first liens on real estate. I advise against permitting any considerable amount of cash to remain on hand uninvested at any time. The Trustee (Ft. W. Nat. Bank) shall have authority to pay taxes on the trust property, employ attorneys and agents with respect to the management thereof, file, prosecute and/or compromise suits and controversies, and they (F. W. N. B.) shall have and exercise all other powers that an absolute owner could with respect to the control, management, disposition, investment and preservation of this trust, and of the different items of property that may belong thereto from time to time. Title to property shall be taken in the name of the Trustee as such, under which name the trust shall be managed and operated.

"The net income from this trust shall be used first to pay the living expenses of my wife, Margaret M. Ellison and my son, Robert A. Ellison, Jr. (The money to be paid to my wife) which is intended to mean that they shall be supported in the manner to which they have become accustomed. For the guidance of the trustee our living expenses after all taxes and insurance have been paid has averaged about five hundred dollars per month. Next the net income from this trust shall be used to make good any losses of principal and any depreciation in the value of the properties. Next the net income from this trust shall be used to increase the value and holding of my properties for the benefit of my son, Robert A. Ellison, Jr.

"For the further guidance of the trustee, I wish my wife and son to live comfortable but without extravagance. I wish my son to be well educated but not over-educated. I wish him to understand his duty to his God and his fellow man and to have to work so he will understand the real purpose and uses of money.

\* \* \* \* \* \*

"This trust is created for the benefit of my son, Robert A. Ellison, Jr., born May 14, 1932. When he reaches the age of thirty (30) years, ten per cent (10%) of the principal of the trust, either in cash or in securities on hand or in other properties on hand shall be delivered to him and thereupon shall become his absolute property. Likewise twenty per cent (20%) at the age of thirty-five (35) years, twenty per cent (20%) at the age of forty years (40); and the balance at the age of (50) years. (See Supplement 'D'). (An unnumbered paragraph relates to children subsequently born. There were none. Its provisions are unimportant here.)

"During the life of the trust herein created for the benefit of my son, R. A. E., Jr., or children, neither the principal nor the income of the trust estate or any part thereof shall ever be liable for debts of any beneficiary thereof.

\* \* \* \* \* \*

"The bank as Trustee shall pay to itself such fees and commissions as may be provided by its regular schedule of fees applicable to such service at that time. If acting in good faith neither the trustee nor substitute trustee shall be required to give bond or be held liable for losses occasioned by errors of judgment.

"I give, devise and bequeath to my wife, Margaret McCracken Ellison, the following property:

"(a) Our homestead at 1305 Summit Avenue, City of Ft. Worth, Tarrant County, Texas, described also as being Lot ————, T. & P. Addition to said City.

"(b) All household furniture and furnishings to be found in our home, including pictures and silver, and automobiles but not excluding any other item of property fairly falling within the general description.

"(c) It is the intent and purpose of this will to dispose of not only my separate property and estate but also the entire community estate of myself and my wife, and she is hereby required to elect whether she will take under this will; in which event she shall waive her interest in our community estate, or whether she will take her share of our community estate, in which event she shall receive nothing under this will.

"(Signed) R. A. Ellison
6/23/33.

## "Supplement 'A'

"I am particularly anxious that my wife, M. M. E. and my son, R. A. E., Jr., be provided with a, first, secure, and, second, a comfortable living as long as they live.

"The purpose of this trust estate is (to) provide my wife with a net spendable income of about $500.00 per month after the expenses of handling the estate have been paid. $500.00 is specified because that is about the amount we are now spending but should be adjusted according to the net income and condition of the estate and the value of the American dollar. Based on present money values, I recommend that on no condition shall the Executor allow a larger living expense, except in case of sickness and such tuition fees and most conservative allowance for the education of my son, or heirs. In addition to the $500.00 per month I recommend that my wife be given about $5000.00 cash every third year for the purpose of travel, automobile, or other luxury she may choose.

## "Supplement 'B'

"I advise that the executor of this trust liquidate, on favorable markets, all real estate and outside management enterprises or business which I may have operated or controlled; bearing in mind that all old employees and stockholders be given due

consideration in keeping with the past policy of the Ellison Family. This is suggested because a bank rarely understands handling any business outside of loans and liquid investments and also to further the easy liquidating of the trust estate.

"It is the intent and purpose of this will to dispose of not only my separate property and estate but also the entire community estate of myself and wife, and she is hereby required to elect whether she will take under this will, in which event she shall waive her interest in our community estate; or whether she will take her share of our community estate, in which event she shall receive nothing under this will.

"(Signed) R. A. Ellison

"Supplement 'C'

"The executor of this trust is directed to liquidate such holding as he may deem necessary to defray all funeral expense and inheritance taxes as are required by law, and expenses of last illness.

"In the event my son should marry after he is 21 years of age, the Executor of this trust may, upon the direction and according to the judgment of my wife, a sum of money not to exceed $5000.00 when and how my wife and the executor may deem to my boy's best interest. Same shall apply to any other of my children.

"All moneys referred to in this will are based on the present value of the American dollar and may be adjusted by the executor according to any change in value and the financial position of the estate and the purpose and intention of this Trust.

"(Signed) R. A. Ellison.

"Supplement 'D'

"The executor of this trust is directed to confer with my wife before final disposition of the last installment which is to be made when my son reaches the age of fifty (50) years. My wife and the executor are to determine at this time as to whether or not my son has lived the kind of life that my wife and the executor would reasonably expect him (my son) to in his turn amply provide for his mother.

"If for any reason he (my son) has become incapacitated or is unworthy of their confidence, then I direct the executor to set aside sufficient of the remaining (50%) fifty per cent of the trust to provide for my wife as previously directed in this will.

"If my wife elects to return our home at 1305 Summit into the Trust estate, I direct the Executor to pay the taxes and insurance on this place from the income of my estate.

"(Signed) R. A. Ellison."

The trustee declared in its petition for construction of the will that it had not deemed it advisable to sell or dispose of certain properties belonging to the estate even though testator did "advise" the liquidation on favorable markets of all real estate and outside enterprises and businesses which he had operated and controlled. It was alleged that there were uncertainties and ambiguities in the will relative to the trustee's power and authority to make sales and disposition of the property; that in its capacity as trustee it believed there were certain discretionary matters committed to it; that the several references to installments to be paid to the wife, if not contradictory in their nature, gave rise to some doubt as to the whole duty of the trustee; that because of such conflicts and uncertainties it was deemed advisable and necessary that the court construe the will to the end that the trustee could properly discharge the trust.

The trustee requested the court to determine:

(1) Does the will limit to $500 per month or some other specific sum the amount of money plaintiff as trustee may pay to testator's wife and son for their maintenance or living expenses?

(2) If not, does the will set forth any rule guiding or limiting the discretion of the trustee as to the amount of money that it may pay over from month to month for the maintenance, living or other expenses of testator's wife and son?

(3) If the will sets forth no such rule, then to what extent, if at all, does the will limit the discretion of the trustee as to the amount of money it may pay to or for the account of the wife and son for their needs and desires?

(4) Is the trustee permitted, under the will, to use funds belonging to the trust estate to pay the taxes and insurance and to make repairs and renovations from time to time on the homestead at 1305 Summit Avenue, which testator devised to his wife?

There were other inquiries made by the trustee, but some of which are conceded by the appealing defendant to raise no de-

batable question, while others will be referred to in connection with the trial court's judgment.

The defendant Margaret M. Ellison answered, adopting those parts of trustee's petition charging uncertainties and ambiguities in the will, and alleged that the will by its terms impliedly left the matters in controversy to the sound discretion of the trustee. She alleged the enhanced values of the property and profits accrued to the estate and that the value of the American dollar had materially changed since the will was written and that the amounts previously paid to her by the trustee were insufficient for the purposes intended by the testator.

The guardian ad litem, for his ward, answered by a general denial of all those parts of the trustee's petition not expressly admitted. He alleged that the will was certain and unambiguous and was not susceptible to a construction different from its plain and unequivocal terms and provisions. He alleged that the trustee had already paid to the surviving wife more than the will provided for and asked that it be replaced in the trust.

The pleadings and evidence offered were submitted to the court and it was found, among other things, that:

(1) There are ambiguities and uncertainties in the will and a necessity exists for its construction by the court.

(2) The $500 per month referred to in the will as being about the amount testator and his family were then spending per month meant that approximately that amount had been necessary to maintain the home itself.

(3) The will does not limit to $500 per month or to any specific amount that the trustee may pay each month to the surviving wife, and that it does not fix any particular amount that could be so paid.

(4) The trustee could pay to the surviving wife, from the trust estate, such sums from time to time as in the sound discretion of the trustee shall seem to it to be necessary, in order that the wife and child could continue to live in the manner and according to the standards to which they were accustomed at the time of testator's death, taking into account the changing needs of the wife and child, the increase or decrease in living expenses as reflected by the purchasing power of the American dollar and the income and condition of the trust estate.

(5) Under present conditions an allowance to the wife for the support of herself and child of $1250 per month, aside from the item of $5000 every third year for the purposes named in the will, would not be an abuse of discretion by the trustee, and that previous amounts allowed by the trustee in excess of the $500 per month are reasonable and authorized by the will.

The foregoing findings and conclusions are made the basis for the judgment entered. Other findings were made, but we think they need not be set out by us. From the judgment entered, the minor, acting through his guardian ad litem, has appealed.

In twenty points presented as a basis for reversal, it is asserted that, (1) the will is plain and unambiguous and no construction of its terms is proper or necessary; (2) the words of "advice", "recommendation", "admonition" and "request" were made to and concerning the trustee and estate, and were therefore mandatory and not precatory; and (3) error in permitting F. O. Shelton to testify that from checks and records of deceased the expenses incurred by deceased for maintenance of his family each of the several months preceding his death was materially more than $500.

 It is elemental that in a case like this, if the language used is plain, certain and unambiguous, there is no necessity for the court to construe it—it speaks for itself and does not need construction.

 The law favors wills. It encourages persons possessed of property to express their desires as to whether it shall pass under the general laws of descent and distribution or in some other way. Such expressions found in testamentary documents will be respected. Payne v. Chance, Tex.Civ.App., 4 S.W.2d 328; Cornet v. Cornet, 248 Mo. 184, 154 S.W. 121. They will be liberally construed to effectuate the primary and dominant purposes and intentions of the testator. Courts will, if possible, discover the real intention of the testator, from the language used by him in his testamentary document, and give effect to those expressed intentions. The applicable rules of construction are that the instrument as a whole will be considered, rather than isolated clauses, phrases or even paragraphs. Language used will be given its most reasonable construction and meaning in arriving at the primary and dominant intention of the one who spoke or used it. If there is no am-

biguity in the will, testator's true intention will be gathered from the instrument alone; if testator's dominant purpose is made clear by the language used, but the means of accomplishing that end is rendered uncertain and susceptible to more than one meaning, then and only then may the court look to conditions and circumstances surrounding the testator when he expressed his desires; in short, the courts will recognize the right of every person who possesses testamentary capacity, to direct in some statutory form how his property shall vest after his death—keeping in mind certain well-recognized restrictions, not necessary here to mention. 44 Tex.Jur., pp. 680–696, sects. 134 to 138, and many cases decided since the cited text was written.

We have carefully studied the will under consideration, and while it evidences the dominant purpose and intention in testator's mind, yet the meticulous care with which he attempted to accomplish his ultimate aims is made uncertain and ambiguous. The many contingencies pointed out by testator render it necessary for the court to construe the language used, not in arriving at the ultimate purposes and intentions, but the manner in which the trustee shall accomplish that end. See Page on Wills, 2d Ed., Vol. 1, page 1377, sect. 812.

As we understand the will before us, testator had two purposes, uppermost in his mind, when he wrote the instrument. They are, in the order named: (1) To provide for the support and maintenance of his surviving wife during her entire lifetime, so that she could continue to live in the manner to which she had become accustomed, and a similar desire concerning his minor son, covering the periods designated. And (2) ultimately for the child to receive the estate left in trust, in installments at the times and controlled by the contingencies specifically enumerated.

These intentions and purposes are emphasized by the language used throughout the document. We observe these significant expressions: "They (the wife and child) shall be supported in the manner to which they have become accustomed." The net income from the estate shall be applied *first* to accomplish this purpose, and then he provided how it should be applied after this had been done. Again he said, "For the further guidance of the Trustee, I wish my wife and son to live comfortable but without extravagance". The last-quoted expression may not mean identically the same as the first-quoted words. Following testator's signature and the date on which he apparently executed and signed that part of the will, there appears in what he designated as "Supplement A" this expression: "I am particularly anxious that my wife, M. M. E. and my son, R. A. E., Jr., be provided with a, first, secure, and second, a comfortable living as long as they live." We may fairly assume that by the first quoted language they had been accustomed to a comfortable living, but by the anxiety expressed later we are forced to the conclusion that he especially wanted his estate to be so used by the trustee that in no event would this primary purpose be neglected, irrespective of everything else.

It cannot be doubted that testator reposed the utmost confidence in the integrity and fairness of his wife and her relation to their child. Likewise, that he felt impelled to provide for their adequate support and maintenance. He was dealing with a sizeable estate when he was a comparatively young man, about 40 years old. He deliberately worded his will so that his wife's community interest, amounting to about $11,000, should be included in the trust which he was creating and attempting to direct, thus depriving her of that community interest, yet making it more than good by his benevolences.

It is further apparent that testator relied upon her judgment in the future in several very material matters. We say this because of such language in the will as the following: "In the event my son should marry after he is 21 years of age, the executor of this trust may, upon the direction and according to the judgment of my wife, (pay) a sum of money (to my son) not to exceed $5000.00 when and how my wife and the executor may deem to my boy's best interest." (The parenthetical words are added by us.) Again, in another part of the will, shown to be "Supplement D", he said: "The executor of this trust is directed to confer with my wife before final disposition of the last installment which is to be made when my son reaches the age of fifty (50) years. My wife and the executor are to determine at this time as to whether or not my son has lived the kind of a life that my wife and the executor would reasonably expect him (my son) to in turn amply provide for his mother." The whole meaning of the quoted provision is not clear, except

in so far as testator was reposing great confidence in the wife over a period of fifty years in the future. In this connection he further said: "If for any reason he (my son) has become incapacitated or is unworthy of their confidence (evidently meaning the wife and Trustee) then I direct the executor to set aside sufficient of the remaining (50%) fifty per cent of the trust to provide for my wife as previously directed in this will."

To enable the trustee to carry out testator's primary purpose of adequately supporting the wife and child during the time the wife will be caring for the son, he provided for and created the trust which his named trustee is endeavoring to perform. It cannot be questioned that testator created the trust for the benefit of his minor son. He said in so many words that, "This trust is created for the benefit of my son, Robert A. Ellison, born May 14, 1932." Following this he provided how certain percentages of the whole should be delivered when the son became 30, 35, 40 and 50 years of age. The last installment of 50% was conditioned as above pointed out, with relation to the life he had lived and the decision of the wife and trustee with respect thereto.

It will be observed that testator gave to the trustee admonitions as to permitting large amounts of money to remain uninvested; suggestions for the guidance of the trustee in amounts necessary for the support and maintenance of the wife and child; that they were at the time the will was written expending about $500 per month, and gave this suggested amount for that reason. In addition to the amount sufficient for their maintenance and support, he recommended that she be given by the trustee about $5000 every third year for travel, automobiles and luxuries. We think it significant, however, that he added: "But (the amounts named) should be adjusted according to the net income and condition of the estate and the value of the American dollar. Based on present money values, I recommend that on no condition shall the Executor (Trustee) allow a larger living expense, except in case of sickness and such tuition fees and most conservative allowance for the education of my son, * * *." The last part of the quoted expression, if considered alone, ignores one potent factor entering into the earlier part of the qualification, that is, the monthly allowance should be adjusted according to the net income and condition of the estate; it also contemplates a further adjustment in case of sickness and tuition (presumably for the proper education of the child). Testator added to his will, in "Supplement C", this language: "All moneys referred to in this will are based on the present value of the American dollar and may be adjusted by the executor (Trustee) according to any change in value and the financial position (condition?) of the estate and the purpose and intention of the trust." These things affect the allowance of the $5,000 every third year the same as they do the monthly allowance.

As we view this appeal, the principal contention is over the question of whether or not the amounts suggested throughout the will are so fixed that the trustee is without power or authority to change them if in its discretion they should be changed or adjusted by it. We think it clear from the language used it was the intention of the testator to vest the trustee with such power and authority; the discretion used by the trustee to be in harmony with and controlled by the things pointed out as affecting changed conditions, if they should occur. Testator did not contemplate that any court should be called upon to determine such matters, since in Supplement C he said the adjustments should be made by the executor, evidently meaning the trustee. The words executor and trustee are used interchangeably throughout the will, and in many instances inaptly used, but the intention in such instances is clear. The will as a whole indicates that testator had unbounded confidence in the trustee to handle the large estate over the long period of time; he went far enough to delegate the powers given to the trustee to its successors; he required no bond or other security for the faithful performance of the trust, nor would he make it responsible for losses sustained by error of judgment. After enumerating many things the trustee could do and perform, as if to make it more comprehensive, he added: "And they (F. W. N. B., trustee) shall have and exercize all other powers that an absolute owner could, with respect to the control, management, disposition, investment and preservation of this trust, and the different items of property that may belong thereto from time to time." Bearing this very general and all-covering expression in mind, certainly the testator intended to and did vest his trustee with power and authority to use its discretion and option

in many matters when not expressly prohibited by some other part of the will.

In some respects the evidence in this case is complicated. It consists in part of audits, inventories of values, deductions for losses in sales, gains in sales of other property, and enhanced values of property belonging to the estate over what it was valued at when it came into the hands of the trustee. Receipts of revenue derived from investments, as well also from rentals of real estate originally inventoried to the trustee, and dividends from shares, stocks and bonds enter into the present value of the estate. It would be futile for us to attempt to make an analysis of all this, even if we could do so. One who is unable to fully appreciate all these facts may suffice it to say that when the estate came into the hands of the trustee and all debts, obligations, taxes and expenses were deducted, the inventoried value of the estate was $418,151.19. In September, 1941, shortly prior to the date of trial, such inventories show the value of the estate to be $692,080.50, a gain in value of $273,929.31. The last-mentioned figure may or may not be the true net gain in value of the property, because of the manner in which the property was originally inventoried, yet it is all we have before us. The increased value of the entire estate does not include the enhanced value of the real estate and livestock, although the testimony discloses these items are considerable. The livestock consisted largely of registered Hereford cattle, and in the very nature of existing conditions many of them had been raised during the ten year period covered.

There is evidence that because of the fact that Mrs. Ellison's home taken under the will was newly overhauled and furnished when she and her husband were married and the lapse of about ten years' time intervening before the date of trial, it had fallen into a state of bad repair and the furnishings were practically worn out; that her living expenses were much more at the time of trial than they were at the time the will was made; she enumerated many of the larger items which had materially increased; she said she could not continue to live in the manner to which she and the child had been accustomed upon the moneys previously paid her by the trustee. Her estimates greatly exceeded those which the guardian ad litem contends were provided by the will. She said that the trustee had advanced to her during the life of the trust an amount averaging about $990 per month for all purposes, but that she had expended $500 out of the aggregate amount for travel and that the amount was insufficient to maintain herself, her home and support the child.

There was testimony offered by the trustee, over the objection of the guardian ad litem, to the effect that after an inspection of testator's books, records and canceled checks, the living expenses over a period of nearly two years before his death amounted to an average of about $900 per month. The figures were admittedly not absolutely accurate for reasons explained. There was no error in the admission of the testimony given as to the opinion of the auditor. The information was compiled by the witness from many documents, including a thousand or more checks, sent up with the record to this court. The general rule in such matters is, that when books and accounts are voluminous, covering many items over a considerable period of time, it is permissible for an expert accountant, who has made an examination of them, to state his opinion as to what they show. Clopton v. Flowers, Tex.Civ.App., 183 S.W. 68; Byrd v. Taylor, Tex.Civ.App., 40 S.W.2d 942, writ dismissed.

There is evidence in the record showing the net income of the estate during the years 1934 to 1940, inclusive. The will was written by testator in 1933, and reference is made in the will to certain expenses for guidance of the trustee in the monthly installments to be paid the wife for the purposes indicated. Testator made reference to the then American dollar valuation. Evidence was offered showing that the purchasing power of the dollar in 1941 was approximately 22% less than at the time the will was written. Many now living may have some misgivings as to the difference then and now as reflected by the testimony, for the "depression period" is still vivid in the public mind. We must accept the statistical figures given. No effort was made to contradict them. All these matters bear upon the conditions under which the testator authorized the trustee to adjust the amounts named by him.

We have not attempted to discuss separately all points raised by the guardian ad litem for reversal, for to do so would unnecessarily extend this already lengthy opinion. Enough, however, has been said to show that the trial court's judgment has

substantial support in the evidence. We have studied all points raised, and have concluded that they should be overruled, and the judgment should be affirmed. Accordingly, we order that this be done.

McDONALD, C. J., not sitting.