**PEARESON v. McNABB et al.**

**No. 11690.**

Court of Civil Appeals of Texas. Galveston.

Oct. 17, 1945.

Rehearing Denied Nov. 15, 1945.

P. E. Peareson, of Richmond, for appellant.

A. D. McNabb, of Dallas, and C. H. Chernosky, of Houston, for appellees.

GRAVES, Justice.

This case originated by the filing in the County Court of Fort Bend County, Texas, by D. R. Peareson, of an application to probate the will of Mrs. Margaret Hollimon, dated October 17, 1940, and have himself appointed as independent executor thereof, he having been so designated by its terms. A. D. McNabb filed in that court a contest thereof, and appealed to the District Court from a judgment of the County Court admitting such declared-upon will to probate and appointing applicant-Peareson independent executor thereof, in accordance with the stated provisions of the instrument.

In the district court, Mrs. Gloyd Foerster and Miss Charlien McNabb were permitted to intervene as contestants. The contest was based alone on alleged mental incapacity and alleged super-inducing insane delusions on the part of testatrix.

A trial before the jury resulted in a finding returned November 7, 1944, that testatrix was not of testamentary capacity when she executed the described instrument. Judgment was rendered on the verdict on November 9, 1944, that the will be denied probate. The court adjourned on November 10, 1944. No motion for new trial was filed.

Proponent filed in the trial court in due time an approved appeal-bond, and has filed in this court an original transcript, state-

ment of facts, and a supplemental transcript.

The controlling over-all question in this court is whether the trial court committed an error of law that "amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment" against him. Rule 434, Texas Rules of Civil Procedure.

Not only was the appealed-from judgment entered upon the sole finding of the jury that Mrs. Hollimon did not have testamentary capacity when she executed the instrument involved on October 17, 1940, but, as further indicated, the finding of that incapacity had itself been wholly based, in turn, upon allegations of the contesting appellees that the lady was at that date suffering from a number of "insane delusions," which had for many years prior to that date continuously and increasingly afflicted her, which disabling mental condition had originated in 1895, when she was only 26 years old, and had so unabatingly continued until her death on December 16, 1943—three years after her execution of the rejected will.

So that, from its inception to its close, this case had to do with that distinctive type of a will contest—that is, one in which testamentary incapacity of the specific kind so declared upon in this instance was the only question of fact alleged or found. It is perforce, therefore, completely differentiated from one of another sort, in which other elements of contest, such as undue influence, were present.

There were many witnesses on both sides of such single controversy on the facts, 30 for the appellants and 24 for the appellees, together with much documentary matter admitted, the originals of some of which have been brought up with this record.

One of such witnesses for the appellant, Dr. W. J. Johnson, testified as an expert only, in response to a greatly extended hypothetical question propounded to him by the appellees, under many objections to the question itself, along with protests against the receipt of his answers thereto, by the appellant, the substance of which involved a long-drawn-out inquiry the appellees themselves characterized as "a fair statement of all material facts in evidence and assumed to be true for the purpose of a hypothetical question."

Appellant attacks the court's charge on testamentary capacity as applied to the alleged "insane delusions" before it, the court's admission and refusal of a vast number of evidentiary offerings, and the entire construction, sufficiency, and receipt by it of Dr. Johnson's answer to the hypothetical question so propounded to him; he further challenges the sufficiency of the evidence to support the pleadings of the appellees, as well as the jury's implied findings upon any one or all of their declared-upon delusions, and asserts that the verdict was without any legally admissible evidence to support it, alternatively adding that, if there was any proper support for it at all, the verdict in toto was so against the great weight and preponderance of the evidence as a whole as to be clearly wrong —to the degree that this court should set it aside.

The trial court's criticised charge on testamentary capacity, as applied to the pleadings and evidence before the court, was this:

"To make a valid will, the person making the will must have testamentary capacity, and must not, at the time of the execution of the will, be laboring under an insane delusion, which influenced the person executing such will to dispose of her property in a way which she would not have disposed of it but for the insane delusion.

"You are charged in connection with the term 'testamentary capacity' that a person, to have testamentary capacity, as that term is used in this charge, is meant that such person at the time of the execution of the will, must have had sufficient mental ability to understand the business in which she was engaged, the effect of her act in making the will, and the nature and extent of her property; she must be able to know her next of kin and the natural objects of her bounty and their claims upon her; she must have memory sufficient to collect in her mind the elements of the business about to be transacted and to hold them long enough to perceive at least their obvious relation to each other and to be able to form a reasonable judgment as to them.

"You are further charged that by 'insane delusion' is meant the belief of a state of supposed facts which no rational person would believe."

This court is unable to uphold appellant's objections to the quoted charge; to the contrary, it finds no fault with that statement of the law when applied to the pleadings and evidence before the court, holding that it squares with the authoritative

deliverances of our Texas courts especially, as well as those of sister states, upon the legal equivalent of the same sort of case. Morris v. Morris, Tex.Com.App., 279 S.W. 806; Breeding v. Naler, Tex.Civ. App., 120 S.W.2d 888, error dismissed; Prather v. McClelland, 76 Tex. 574, 13 S. W. 543; Rodgers v. Fleming, Tex.Com. App., 3 S.W.2d 77, reversing Rodgers v. Fleming, Tex.Civ.App., 295 S.W. 327; Vance v. Upson, 66 Tex. 476, 1 S.W. 179.

Neither can appellant's claims that the jury's verdict was either without any evidence to support it, without sufficient evidence, or so against the preponderance of the testimony as a whole as to be clearly wrong, be sustained.

■ On the contrary, there can be no substantial doubt in this court's mind, assuming as it does—for the moment—there was a justiciable controversy before the court over them, that the evidence was amply sufficient to sustain some if not all of the declared-upon delusions.

The appellant, in insisting that upon the well-settled rule the state of the testator's mind at the very time of executing her will is the controlling test of its validity, Vol. 38 West's Tex.Dig. Wills, ☞21, p. 255; Payne v. Chance, Tex.Civ.App., 4 S. W.2d 328, apparently overlooks the alleged distinctive character of the incapacity here; that is, that Mrs. Hollimon was declared to have suffered a disastrous and never-cured shock to her mental and physical processes from the tragically sudden death by gun-shot wounds of her husband 45 years before, back in 1895, as indicated, and that the train of alleged delusions developed almost immediately from it; and that, as a successive result of that calamity to her, they each and all not only unabatedly but progressively remained with her in all their disabling effect upon her mental condition and capacity until she undertook to execute this paper on October 17, 1940, and even until she died thereafter, on December 16 of 1943.

Indeed, there is, in the opinion of this court, as indicated, no doubt whatever that, if these mental conditions (or any substantial number of them) that witness after witness for appellees testified to constituted a disqualification to execute a will as required by law, there was ample evidence before the jury to have supported specific findings that she was afflicted with such delusions continuously, as each one in turn developed, beginning with such shock in 1895 and continuing down until her act of October 17, 1940.

The enumerated delusions were, in substance, these:

"First, she repeatedly said she was not going to leave anything to the McNabb children, not even five cents, because they were no kin to her except Johnnie; second delusion—proved by Mrs. Hollimon's statement to Mrs. Hyatt in October 1939 that Miss Charlien was going to kill her with a butcher knife; third delusion—that the Carrie Nation bunch would kill her; fourth delusion, in that she believed that Johnnie McNabb's brother and sisters had railroaded him to the insane asylum in order to get control of his money; fifth delusion—that Miss Charlien was crazier than Johnnie, and so stated; sixth delusion—that she could brick-veneer her home, and it would stand forever, and she so stated to some of her friends; seventh delusion, in that she considered and was afraid that the people of Rosenberg would burn her out; eighth delusion—that Johnnie was of sound mind; ninth delusion, in her vigorous and strenuous contention, dating back from at least 1904, that the Rosenberg Independent School District and city of Rosenberg were assessing her property too high and getting too much of her tax money; tenth delusion—that she could hear voices and could hear them as early as between 1932 and 1935; eleventh delusion, in her belief that she could communicate with spirits, and that they had related to her that the world would come to an end; twelfth delusion, in that she believed that it was necessary for her to sleep in her clothes, all except her shoes, in order to keep her deceased husband from seeing part of her body and she declared no man, not even her husband, had ever seen any part of her body, except her hands and face; thirteenth delusion, in that she thought Mr. Hollimon would return some day and they would live in that house together forever; fourteenth delusion—that the people of Rosenberg hated her and she so stated on numerous occasions; fifteenth delusion—that the City passed an ordinance just to make her put in sewerage facilities; sixteenth delusion—that the people of Rosenberg, and especially the City Officials, would not permit her to improve her property."

■ In holding the evidence sufficient to have supported an affirmative finding of the jury on each one of these recited condi-

tions, it would be supererogatory to detail the evidence upon which the findings might have been arrived at; indeed, under the uncontroverted testimony of the witnesses severally reporting each of them, these quoted and alleged "delusions" were each and all declarations of Mrs. Hollimon herself, hence were as such, as this court understands the rule in a single-shot case' like this involving mental capacity alone—unmixed with any issue of undue influence—admissible as establishing her mental condition and consequent conduct; nor were they either too remote, or hearsay testimony, as appellant contends. McCormick & Ray on Evidence, Sec. 419; also Secs. 417, 418, 420–423; Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138, 1144; Shailer v. Bumstead, 99 Mass. 112; 11 Am.& Eng. Ency. Law (1st Ed.), p. 156; In re Baker's Estate, 176 Cal. 430, syl. 9–11, 168 P. 881; In re Balk's Estate, 289 Mich. 703, 287 N. W. 351, 124 A.L.R. 431; In re Brown's Estate, 52 Idaho 286, 15 P.2d 604; Johnson v. Brown, 51 Tex. 65, 78 to 80; Reel's Ex'rs v. Reel, 8 N.C. 248, 9 Am.Dec. 632; State v. Hays, 22 La.Ann. 39; Wigmore, § 228, page 9; § 228, page 10; §§ 227–233; § 1734, page 106; § 1738, pages 119, 121; §§ 1740, 1790; 19 Words and Phrases, Perm. Ed., Hearsay.

In this connection, an outstanding feature running through all the testimony for both sides—with perhaps no deviation from that statement by any witness for either—is the uniform recitation and opinion that the condition of Mrs. Hollimon's mind never changed, but always remained the same during the entire time that they knew her, and about which they testified; in other words, regardless of any and all subsequent developments of facts, she never receded from any of those positions or conditions.

As indicated appellant's repeated objections to the receipt of any or all of these quoted declarations was that they were too remote in time, circumstance, and application, and constituted mere hearsay talk on the part of those witnesses who reported Mrs. Hollimon's having said them; but obviously, it is thought, the declarations themselves, standing apart as such, constitute a different class of evidence, and, under the last-cited authorities, were neither hearsay nor remote—especially in view of the like report running through them all from the witnesses who heard her say them, that Mrs. Hollimon's mind never changed on any of the subject matter thereof, but continued the same through the time she executed this instrument, and on until her death three years later.

The attending facts underlying all of the claimed delusions were either undisputed or supported by evidence this court deems sufficient to have supported, if it did not require, findings by the jury that the facts and conditions they severally asserted were so plainly to the contrary of Mrs. Hollimon's beliefs and assertions upon them that, in the language of the trial court's quoted definition of "insane delusions," "no rational person would have believed them"; for instance, with the undisputed facts showing directly the opposite—that the McNabb children, being her half-nephew and nieces by blood, were not only such kin to her but her next and only such kin—she nevertheless throughout her entire life continued her assertion that "it was facts" that they were no kin to her, except Johnnie.

Others to the effect that Johnnie McNabb's brother and sisters had railroaded him to the insane asylum to get control of his money when he was not insane at all, etc., whereas, under the irrefutable facts open to everybody, he had been put when a child in the State Hospital, hopelessly insane, where years later he died in that condition, he having been put and kept there by the public authorities only, and his money turned over to a court-appointed administrator—thus classing this idea as a mere figment of a disordered mentality.

Likewise, the iridescent dream that she could "brick-veneer" her home and it would last forever, where she and her returned husband would live, after which it would so go down "from generation to generation" to members of her family; of similar ilk was her belief and prophecy, asserted by her to have been communicated to her by those "in the spirit world," that this world would come to an end in 1939; still another was her pathetic imagining that her beloved and departed husband would return and "live with her in her brick veneer home," hence it behooved her, like the Vestal Virgins, to keep a kerosene lamp always burning in the hall of her home to guide him to her, where she would be sleeping in her clothes ready to receive him—both of which practices she was shown to have religiously followed until her death.

It is so with all the others of these states-of-mind—in the light of the simple facts

the other way, out of which they emerged; they were self-evidently incomprehensible emanations from the irrational mind of an abnormal introvert.

Some of the terms of the will itself furnished intrinsic evidence—cumulative of the testator's quoted declarations—of the delusional nature of her mental processes in executing it, to-wit:

(1) It contained provisions for a place for Johnnie McNabb to live, when he came home. (2) In anticipation of Mr. Hollimon's expected return thereto, she provided in the will that her residence property should never be sold, but delegated power to her trustees to dispose of everything else, except the cemetery.

It is not held that the trial court committed no errors of law during this extended trial—in view of the great length of the proceedings and the well-nigh innumerable rulings it was called upon to make, it hardly seems probable that at least some ad interim errors were not made; but, what this court does determine, as recited supra, is that upon the trial as a whole, that court has not been shown to have denied any such right in appellant as rendered its judgment against him improper; it follows that an affirmance thereof should be entered. Judgment affirmed.

Affirmed.