**Reversed and Remanded and Memorandum Opinion filed January 23, 2014.**



In The

# Fourteenth Court of Appeals

### NO. 14-13-00041-CV

## IN THE ESTATE OF BARBARA CHAPMAN, DECEASED

**On Appeal from the County Civil Court at Law No. 1**
**Fort Bend County, Texas**
**Trial Court Cause No. 11-CPR-023801**

## M E M O R A N D U M    O P I N I O N

In this will contest, appellant Sean McNiece, the sole surviving child of Barbara Chapman, contends that the trial court erred in granting summary judgment rejecting his claims that his mother lacked testamentary capacity and that she executed the will as the result of her sister's undue influence. We agree that Sean raised genuine issues of material fact on both of these issues. We accordingly reverse the summary judgment and remand the case for further proceedings.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Because the appellant's arguments rely heavily on the chronology of events, we state the factual background of the case in the form of a timeline. Each of the decedent's relatives shares a last name with at least one other person in the case, so we have referred to each individual by his or her first name.

Barbara Chapman had a history of alcohol abuse, and was hospitalized for seizures in October 2009 and again in November 2009. In May 2010, she and her husband Sidney McNiece divorced. Barbara moved out of the marital home in August 2010, but for some unstated period of time, Sidney continued to visit her. She continued to send money to their only surviving child, Sean McNiece, until November 26, 2010.[1]

In December 2010, Sean was arrested for bank robbery and is currently serving time in a federal penitentiary. Barbara was "very distraught" over his arrest.

On January 7, 2011, Barbara signed a statutory power of attorney appointing her sister Catherine Valby ("Cathy") as her attorney-in-fact. On January 25, 2011, Cathy called attorney Frank Holcomb and asked him to help Barbara with estate planning. Cathy told Holcomb, "'Barbara has been depressed and on medication; but she is competent. She really does not want to address these issues, but she needs to because her health is not good.'" Holcomb arranged with Cathy for him to meet with both Cathy and Barbara.

The first meeting with Holcomb took place on January 28, 2011. Holcomb was given a schedule of Barbara's assets, but he did not know who prepared it. He later stated, "Cathy played a fairly minor role in our discussions, letting Barbara

---

[1] Their other son, Matthew, was killed in an automobile accident in 2006.

answer questions and tell what she wanted to do." Holcomb stated that he attempted repeatedly to get Barbara to agree to allow him to create some form of a trust for Sean, but Barbara rejected the attorney's suggestions. Holcomb saw no evidence of alcoholism or drinking, nor were these subjects discussed.

After the documents were prepared, Holcomb sent them to both Barbara and Cathy. Cathy twice called with minor changes to the documents. Holcomb never spoke with Barbara outside of Cathy's presence. He sent the invoice for his work only to Cathy, and her husband Scott signed the check paying the attorney with funds from Scott and Cathy's joint checking account.

On February 17, 2011, Barbara and Cathy again went to Holcomb's office where Barbara executed the will. In the will, Barbara stated, "I have one son, SEAN GLEN PETER McNIECE, who I do not intend to inherit under this Will, nor do I intend for any of his issue to inherit. Instead, the primary beneficiary under this Will is my sister, BEVERLY G. CHAPMAN." At this meeting, Holcomb explained the documents briefly, but he does not recall if Barbara had any questions.

On March 3–16, 2011, Barbara was hospitalized in critical condition. In a medical note dated March 16, 2011, health-care personnel wrote that Barbara "[a]pparently drinks quite a bit more than she admits to." After this hospitalization, Barbara was considered terminally ill and received hospice care. She died on June 12, 2011.

Cathy applied to probate the will, and Sean filed his opposition to the probate of the will and to the issuance of letters testamentary. Cathy moved for traditional summary judgment on Sean's claim that Barbara lacked testamentary capacity and for no-evidence summary judgment on his claim that Cathy exercised undue influence over Barbara. The trial court granted both motions.

## II. ANALYSIS

In two issues, Sean contends that the trial court erred in granting summary judgment because there are questions of fact about whether Barbara had testamentary capacity when she executed the will and about whether Cathy exercised undue influence.

We review the trial court's grant of a summary judgment de novo. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007)). We consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). We must affirm the summary judgment if any of the movant's theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The movant meets this burden only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant facially establishes its right to summary judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine issue of material fact sufficient to defeat summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

In a no-evidence motion for summary judgment, the movant represents that there is no evidence of one or more essential elements of the claims for which the

nonmovant bears the burden of proof at trial. TEX. R. CIV. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to the elements specified in the motion. *Mack Trucks*, 206 S.W.3d at 582. We sustain a no-evidence summary judgment when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 816.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In considering grounds for reversal, we are limited to those grounds expressly set forth in the summary-judgment motions, answers, or other responses, and may not rely on the appellate briefs or summary-judgment evidence. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993); *Ron v. AirTran Airways, Inc.*, 397 S.W.3d 785, 788 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The evidence is insufficient to raise a genuine issue of material fact if "it is 'so weak as to do no more than create a mere surmise or suspicion'" that the challenged fact exists. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (quoting *Kroger Tex. L.P. v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006)).

## A. The trial court erred in granting traditional summary judgment on Sean's claim that Barbara lacked testamentary capacity.

Although Cathy met her initial summary-judgment burden on the issue of Barbara's testamentary capacity, we agree that Sean responded with evidence raising a genuine issue of material fact.

Testamentary capacity means possession of sufficient mental ability at the time of execution of the will, (1) to understand the business in which the testatrix is engaged, the effect of making the will, and the general nature and extent of her property, (2) to know the testatrix's next of kin and the natural objects of her bounty, and (3) to have sufficient memory to assimilate the elements of the business to be transacted, to hold those elements long enough to perceive their obvious relation to each other, and to form a reasonable judgment as to them.

*Guthrie v. Suiter*, 934 S.W.2d 820, 829 (Tex. App.—Houston [1st Dist.] 1996, no writ). In the estate-planning meeting, Barbara specifically told Holcomb that she did not want her son Sean to inherit. Moreover, the attorney offered a great deal of testimony relevant to Barbara's capacity. According to Holcomb,

There was a lot of discussion about the divorce, the situation with [Barbara's] ex-husband, her concern about a house transaction that I heard about and influence regarding the possibility that the ex-husband would control the son's funds one way or the other, and she wanted to avoid that.

. . . .

She told me that she was worried that [her son] would not be able to get off his drug habit and that funds would kill him. I responded, but you could put it in a trust. Her comment was something along the lines of, yeah, but ex-husband would be acting for the son and be getting distributions and that's just something — she said, "I've just had too much."

. . . .

I discussed with Barbara how she wanted the will structured at our initial meeting, and we spent a significant amount of time going through her options. And at the meeting [in which she executed the will,] we went over some of that again to make sure it was — that she — it did what she wanted it to do.

. . . .

We talked about who she wanted to inherit and what form[.] She was very familiar with who the members of her family were and what type of bequest she wanted to leave[.]

6

By this evidence, Cathy met her burden of proof, and the burden to raise a genuine issue of material fact shifted to Sean.

In his summary-judgment responses, Sean attempted to raise a fact question regarding Barbara's testamentary capacity on the day she executed the will by showing that she was incompetent at other times. In reviewing this evidence, we are mindful that "only that evidence of incompetency at other times has probative force which demonstrates that that condition persists and 'has some probability of being the same condition which obtained at the time of the will[']s making.'" *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968) (quoting 1 MCCORMICK & RAY, TEXAS LAW OF EVIDENCE § 896 (2d ed. 1956)).

Sean produced evidence that Barbara had a history of alcoholism, but alcoholism itself is not synonymous with a lack of testamentary capacity. *See Payne v. Chance*, 4 S.W.2d 328, 329 (Tex. Civ. App.—Amarillo 1928, no writ) ("Proof of habitual intoxication raises no presumption that incapacitating drunkenness existed at the time the will was executed."). There is no evidence that Barbara was inebriated when the will was executed or that alcoholism rendered her continuously incapacitated.

On the other hand, Barbara was hospitalized in March 2011 with "pleural effusion" and "had elevated pneumonia which affected her mental status." The doctor noted that she "[a]nswers simple questions at times," and identified her as married, though in fact, she was divorced, which suggests that she could not correctly identify her next of kin.

There is some evidence that the same condition existed when the will was executed. On January 11, 2011, more than a month before the will was executed, Barbara saw her doctor, who documented that he "suspect[ed] pleural effusion"— the condition that was diagnosed a couple of weeks after she executed the will—

7

and wrote that Barbara "is married," which is some evidence that her mental status was affected even then. This is consistent with the affidavit of Barbara's ex-husband Sidney, who attested that "after December 2010," Barbara could not focus well on any subject when they talked; that she could not maintain a thought for very long; and that her mind wandered." He also attested that "after [Barbara] became so ill, she . . . asked me to take her home (back to our marital homestead on Pine Street)."

In addition to the foregoing evidence, Barbara's physician Dr. Ivan Mefford wrote a letter on April 13, 2011 in which he stated in relevant part as follows:

> [Barbara] has consistently shown poor judgement [sic] in the time I have known her with respect to her own health and has most recently been unable to manage her own financial affairs, healthcare decisions[,] and is presently unable to manage routine activities of daily living. These include food preparation and diet, routine hygiene and general decision[-]making. . . .
>
> It is my opinion that she is unable to make significant life decisions and is unable to care for herself.

Although Dr. Mefford did not identify the date on which Barbara's incapacity began, Barbara executed a statutory durable power of attorney on January 7, 2011, naming Cathy as her attorney-in-fact and empowering her to handle all of Barbara's financial affairs. Cathy testified that Barbara assigned these powers to her because of her ill health.[2]

Finally, Holcomb testified that at the estate-planning meeting, he was given a schedule of Barbara's assets. Holcomb did not know who had prepared the schedule, but a note was stapled to it containing contact information for Cathy's husband Scott Valby. According to Holcomb, this information was stapled to the

---

[2] Even though Cathy told Holcomb that Barbara was in poor health and was "on medication," the attorney failed to ask any questions about Barbara's health or the medication's effects.

schedule of Barbara's assets for Holcomb's use in sending correspondence to Cathy.

Taking all of this evidence together, and drawing all inferences in favor of the summary-judgment respondent, a reasonable fact-finder could infer that Barbara appointed an attorney-in-fact because her health had declined so far that she was no longer capable of consistently identifying her next of kin, listing her assets, or handling her own affairs in general. On this record, there is at least a question of fact as to whether Barbara still possessed testamentary capacity at the time she executed the offered will.

We sustain this issue, and reverse the portion of the trial court's final judgment granting Cathy's motion for traditional summary judgment on the issue of testamentary capacity.

**B.    The trial court erred in granting no-evidence summary judgment on Sean's claim of undue influence.**

To establish undue influence,

> the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence.

*Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). Cathy moved for summary judgment on the grounds that there was no evidence of the second and third of these elements. Because all of the evidence that supports the existence of a material fact question on the third element is also evidence of a material fact question on the second element, we address these elements in reverse order.

### 1.    *Sean produced more than a scintilla of evidence that Barbara would not have executed the will but for Cathy's influence.*

The evidence on this point is particularly clear cut. In response to the

9

summary-judgment motion, Sean produced excerpts from Holcomb's deposition in which he testified that he wrote a memo to Barbara's file around the time that he spoke with Cathy about drafting Barbara's will. According to Holcomb, Cathy told him,"'[Barbara] really does not want to address these issues, but she needs to because her health is not good.'" This statement indicates that Barbara did not wish to make a will at all.

Despite Barbara's desires, Cathy contacted an attorney of her own choosing, who had never met Barbara. Cathy made the initial appointment, transported Barbara to the attorney's office, and was present throughout their conversation. After the meeting, Cathy left two phone messages concerning changes to be made to the documents that the attorney had prepared. Cathy later transported Barbara back to the attorney's office to execute the will, and Cathy's husband Scott Valby then signed the check paying the attorney with a check drawn from Scott and Cathy's joint checking account. Cathy was present for every conversation that the attorney had with Barbara about the documents he was preparing for her signature, but Barbara was not a party to all of the conversations that the attorney had with Cathy on the same subject.

In sum, everything in connection with Barbara's will was done at Cathy's instigation and under her eye, even though Cathy admitted to the attorney that Barbara "does not want to address these issues." Holcomb himself conceded that "there might have been influence to get them done . . . ."

We conclude that the evidence is legally sufficient to raise a genuine issue of material fact on the question of whether Barbara would have executed this will absent Cathy's influence.

***2.*** ***Sean produced more than a scintilla of evidence that Cathy's influence subverted or overpowered Barbara's mind at the time the will was executed.***

Having concluded that there is more than a scintilla of evidence that Barbara would not have executed the offered will absent Cathy's influence, we now address the second element: given Cathy's admission to Holcomb that Barbara did not want to address these issues, why did Barbara do so?  After drawing all reasonable inferences from the summary-judgment evidence in Sean's favor, a reasonable factfinder could conclude that Barbara executed the will because at that time, Cathy's influence had subverted or overpowered Barbara's mind.

"[W]eakness of mind and body, whether produced by infirmities of age or by disease or otherwise, may be considered as a material circumstance in establishing this element of undue influence."  *Id.* at 923.  Here, we know that Barbara was ill.  When Cathy initially contacted Holcomb to arrange for him to draw up Barbara's will, Cathy told him that Barbara "need[ed] to" address those issues "because her health is not good."  For the reasons previously discussed, there is at least a fact question as to whether Barbara's health made her so impaired that she lacked testamentary capacity.  Moreover, Barbara's ex-husband Sidney attested that Barbara told him she was afraid of Cathy.  *See Wils v. Robinson*, 934 S.W.2d 774, 780 (Tex. App.—Houston [14th Dist.] 1996) ("Undue influence has been defined as that which compels the testator to do that which is against his will from fear, the desire of peace, or some feeling which he is unable to resist.") (internal quotation marks omitted), *writ granted w.r.m.*, 938 S.W.2d 717 (Tex. 1997).

On this record, a reasonable factfinder could conclude that in executing the will, Barbara was not acting in accordance with her own wishes but in accordance with those of her sister.  We accordingly sustain this issue and reverse the portion

of the trial court's final judgment granting Cathy's no-evidence motion for summary judgment on the issue of undue influence.

## III. CONCLUSION

Having sustained each of the issues presented, we reverse the trial court's judgment and remand the case for further proceedings not inconsistent with this opinion.


/s/    Tracy Christopher
Justice


Panel consists of Justices Christopher, Busby, and Brown.