## No. 2211.

## KEZIAH KELLY ET AL. *v.* W. J. SETTEGAST.

1. JURISDICTION—PRACTICE.—Trials in the district court on appeals from a county court are had de novo, and in an appeal from a judgment admitting a will to probate, all evidence will be heard in the district court which could have been admissible in the county court.

2. WILLS—PRESUMPTION.—The fact that a person has executed a testamentary paper in the mode prescribed by law, is ordinarily deemed sufficient evidence that the instrument speaks the language which the testator desired to use, and thereby reflects his wishes in regard to all matters of which it speaks.

3. WILLS.—When the evidence shows that a testator who was of sound mind, able to read and write, and in no way unable to acquire knowledge of the contents of a paper by exercising his natural faculties, signs a testamentary paper, and procures it to be witnessed in the mode prescribed by law, the will should be admitted to probate without further proof that the testator knew its contents, if free from suspicion regarding facts connected with its execution.

4. SAME.—But when a paper writing, purporting to be a will, was copied from another writing made by one who by its terms was to receive a large portion of the estate (all the natural heirs being disinherited), and the testator was aged, infirm, and unable to read, the mere formal proof of the execution of the paper will not entitle it to probate. In such a case it should be shown that the testator correctly understood the contents of the paper signed by him.    On this point Hallison v. Rowan, 3 Washburn, 385; Beall v. Mann, 5 Georgia, 469, and other authorities cited in the opinion, approved.

5. FACT CASE.—See the case for facts held insufficient to authorize the probate of a will.

Appeal from Brazoria. Tried below before the Hon. William H. Burkhart.

The will paper writing, which was produced as the will of the deceased Hugh Kelly, was as follows:

"In the name of God, amen!

"I, Hugh Kelly, being of sound mind and desiring to settle my estate with which God has blessed me, while I have capacity so to do—

"First, I desire that my funeral expenses and all my just debts be paid by my executor, hereinafter named.

"Secondly, I appoint W. J. Settegast the sole executor of this my last will and testament, and direct that there be no proceedings had in the settlement of my estate, except the probate of this will and the filing of an inventory, and direct that no bond shall be required of my executor, hereinafter named.

"Thirdly, I will and bequeath to my beloved friends, W. J. Settegast and J. J. Settegast, all my property, be it real or personal, of whatever description, which I now own or may be entitled to by inheritance or otherwise.

his
"Hugh + Kelly.
mark.

"Witness: G. H. Hermann.
        "Wm. Dagg."

The material facts in evidence are stated in the opinion.

*W. B. Hamblin, Fisher & Kirlicks,* and *Stratton & Ballowe,* for appellants: On their proposition that the affidavit of William Dagg was improperly admitted in the district court, that court having only appellate jurisdiction in matters of probate, as the affidavit was such as the law requires to be taken and reduced to writing in open court (county court) and recorded with the will, they cited Revised Statutes, title 37, chapter 1, article 1790; same title, chapter 5, articles 1853, 1854; article 5, section 16, Constitution of Texas.

On their proposition that the law regards with just suspicion a will executed with total disregard of the ties of blood, and requires the clearest proof of mental capacity, where there is no active agency on the part of the testator in the execution of his

last will, but mere acquiescence in what others do in the matter. The jury should have been so instructed, they cited Redfield on Wills, 514, 515, pages 121, 122, chapter 10, section 38; chapter 10, pages 521, 522, section 38 and notes, pages 527–530 and note.

On their proposition that testamentary capacity must exist at the very time of the execution to make a legal and valid will; it must also be the unbiased and voluntary product of the testator's mind; its making must be conceived and originated by him, and its execution wholly and actively directed by him (where another signs by his direction), and it must fully and clearly express his desires, they cited Redfield on Wills, chapter 4, section 15, pages 130–133, top paging and notes; 32 Missouri, 411; 12 Michigan, 459; 42 Barbour, 271; 28 Illinois, 406; 35 New York, 594.

On their proposition that a will not written by a testator must be drawn by his direct, unsolicited instructions, and at his free request, and the testator must possess testamentary capacity when the instruments are given and the request made, they cited Revised Statutes, title 99, page 712 (Wills); Redfield on Wills, pages (at top) 201–210, section 18, volume 1; also chapter 4, pages 121–136 and notes; clause 15, page 129, chapter 11, page 667; also note on pages 516–518.

*Stewart & Breaker* and *E. J. Wilson*, for appellee: On their proposition that extracts from commentaries "that the law regards with suspicion wills executed with total disregard of the ties of blood," etc., as stated by appellants, are not proper to be embraced in the general charge of the court to the jury. The Statute of Texas giving to all persons over twenty-one years of age and of sound mind the right to make his or her last will and testament, the only *onus probandi* upon the proponent is to establish by proof satisfactory to the court and jury that the testator was of sound mind, and that he executed the will with the solemnities and formalities required by law. The only legitimate inquiry is, was the instrument the act of a sound disposing mind? If so, it is not viewed with suspicion, because it is a statutory right, they cited articles 4857–4859, title Wills, Revised Statutes; also section 3, final title, General Provisions; Revised Statutes, 718: "The Revised Statutes shall constitute the law of this State respecting the subjects to which they relate, and the provisions thereof shall be liberally construed with a view to effect their objects." Also volume 1, Redfield on Wills,

fourth edition, 128, and authorities cited in notes; Beazley v. Denson, 40 Texas, 416.

On their proposition that it is sufficient if the testator knew what he was doing and to whom he was giving his property, and understood what he was about, they cited Horne v. Horne, 9 Iredell, approved by Supreme Court of Illinois; Yoe v. Harris, 7 Chicago Legal News, 163; Redfield on Wills, volume 1, chapter 4, page 126, fourth edition.

STAYTON, ASSOCIATE JUSTICE. Hugh Kelly died on September 12, 1883, leaving a paper which was presented for probate as his last will, on September 17, 1883, by the terms of which he gave all of his property, not required to pay his debts, to W. J. and J. J. Settegast.

Kelly left one daughter and some grandchildren, who were the children of a deceased daughter. The will was admitted to probate in the county court, although contested by the daughter of Kelly in her own behalf, and as the representative of the children of her deceased sister. An appeal from the decree probating the will was prosecuted, and on the trial one of the subscribing witnesses to the paper offered as the will of Kelly was permitted to make in open court a written sworn statement tending to show the execution of the paper by Kelly. It is claimed that this could not be done in the district court. Trials on appeals from a county court are had de novo. The district court acquires jurisdiction to hear the contest, and to establish or reject a will, as the facts may require, as fully as has the county court in the first instance, and we are of the opinion that any evidence may in it be taken and heard which might legally be in the county court.

If a will should be admitted to probate by the county court on the evidence of one of the subscribing witnesses, it would surely be proper, on appeal, to hear the evidence of another subscribing witness, or any other evidence admissible upon such a question.

The important question in this case is, did the district court err in refusing to grant a new trial, based on the claim that the evidence was not sufficient to show that the paper was executed under such circumstances as to make it the last will of Hugh Kelly?

The evidence seems sufficient to show that at the time the paper is claimed to have been executed by Kelly he was of sound mind; and there is evidence tending to show that, if he executed

the instrument with a full knowledge of its contents, he did so without the exercise of any undue influence brought to bear upon him to induce him to make the disposition of his property in favor of persons not related to him by blood to the exclusion of those who were.

The paper offered for probate was dated August 23, 1883, at which time, it is shown by the evidence of the two subscribing witnesses to it, Kelly was very ill at the house of one of the persons to whom the will gives his property. He was an illiterate man, and unable to read or write. It is not shown that he ever gave to any one instructions to write a will, or that he had requested one to be written.

One of the subscribing witnesses stated that Kelly was about seventy years old, and very ill at the house of J. J. Settegast. That on the evening of August 23, 1883, he attended Kelly until about sun down, when he came down stairs and saw W. J. Settegast approaching the house; met him at the gate and asked him where he had been; that Settegast then showed him a paper at which he looked and saw that it was a will not signed, whereupon he suggested to Settegast that he had better get some other person to write it; that Settegast then left him and returned in about half an hour, after which they took supper together at the house of W. J. Settegast.

The witness then stated that "after supper myself and Mr. W. J. Settegast walked over to Mr. J. J. Settegast's house. We went up stairs in the room where Mr. Kelly was lying sick. We talked to him a little while, and he said he wanted to get up on the chamber, and when he got through got back in bed, and Mr. W. J. Settegast pulled out a paper and read it to him. I was standing by and heard it read, and knew it to be the wording of a will. After Mr. Settegast got through reading it, he asked Mr. Kelly if there was anything else he wanted. Mr. Kelly said he wanted a couple of witnesses. He seemed to be satisfied, and wanted me to witness the will and wanted another witness, and I suggested Mr. Markham, and he said yes, Mr. Markham would do, and to get Mr. Markham. Mr. Settegast remarked that he thought Mr. Markham had gone to bed; as he had set up the night before he was very tired. Mr. W. J. Settegast said Mr. Dagg was here, and Mr. Kelly said 'well, get Dagg.' Mr. Settegast went out of the room and Mr. Dagg came in. After Mr. Dagg came in the will was lying on a little table near the head of Mr. Kelly's bed. I picked up the will and asked Mr. Kelly if

2

he had heard it read; he said he had. I asked him if this was his will; he said yes. I asked him if it was as he wished it, and did it suit him; he said yes, he wanted me and Mr. Dagg to witness it. I asked Mr. Kelly if he wanted me to sign his name; he said yes. I signed his name. I was right at the bed and turned around. Mr. Kelly was lying on his back, and I held the pen and told Mr. Kelly to touch the pen. He turned on his left side and caught hold of the end of the pen; he caught the pen with his right hand, and I drew it and made the mark, and I held the pen while he made the mark to the will. After that he said, 'it was all right, George,' I think."

On cross examination, the witness stated that when he saw the paper at the gate it was in the hand writing of W. J. Settegast, and that he suggested that he thought it best that the will should not be in his hand writing; that "it would look better to get Dr. McDonald to write it, as he had written one will before." "After Kelly signed the will with his mark he turned back in the bed. Don't know that I could give his exact words after signing the will. It is my recollection that he said 'that is all right, George,' or 'is it all right, George?' I told him, I think, that it was all right. That is all that was said in regard to the will."

The deceased and the two persons whose names appear as subscribing witnesses were the only persons in the room at the time the paper is claimed to have been executed.

The paper exhibited to the witness at the gate and in the hand writing of one of the beneficiaries, was copied between that time and the time that the witness and W. J. Settegast entered the room of the deceased on the same evening, and by the person suggested by the witness. It was shown that the witness has no interest in the will; that he had some business association with a beneficiary under it, and that he, Settegast and the deceased were together interested in cattle, at the time the paper was executed.

The other subscribing witness testified to the execution of the paper by the deceased, and by the subscribing witnesses, substantially as did the former, but knew nothing in regard to the reading of the paper to the deceased, not being present at the time the paper is claimed to have been read.

The will is very short, is so carefully and accurately drawn as to indicate that it was drawn by some person familiar with the rules applicable to, and the language appropriate to such instru-

ments, and it contains but one devise or bequest, which disposes of the entire estate, and covers less than six lines of the transcript.

There is evidence tending to show that one of the subscribing witnesses, after the death of Hugh Kelly, denied that he had witnessed a will, but declared that he had witnessed a paper which he understood to be a settlement between the deceased and the other subscribing witness in regard to cattle.

There was much evidence tending to show that the deceased felt unfriendly to his own child and grandchildren, on account of the unchaste lives which his two daughters had led; but there was testimony tending to show that he had subjected them to such association as would most likely bring about such a result; that he had not shielded them from low association, bad influences and temptations, and that his own course of life was well calculated to mislead those who would look to him for an example, as was it such as to induce the belief that the departure of his daughters from the path of virtue would not so deeply stir his feelings as to cause him to disinherit his own blood and bestow his estate on persons in no way related to him, towards whom, however, the evidence tends to show he felt very friendly.

Ordinarily, the fact that a person has executed a testamentary paper in the mode prescribed by law is deemed sufficient evidence that the instrument speaks the language which the testator desired to use, and truly reflects his wishes in regard to all matters of which it speaks. The fact that a testator knew and understood the contents of a paper which he executed as a will, is a necessary fact to be established before any will can be admitted to probate.

If a person of sound mind, able to read and write, and in no way incapacitated to acquire knowledge of the contents of a paper by exercising the faculties he has, signs a testamentary paper and has it witnessed as required by the statute, then upon proof of these facts the will ought to be admitted to probate without further proof that the testator knew the contents of the paper, unless suspicion in some way be thrown upon it; for it is to be presumed that every such man examines and knows the contents of every instrument he executes, and especially so when it is made for the purpose of disposing of his estate in the solemn form required by law in the making of wills.

It has consequently been held that such a person need not be shown to have had knowledge of the contents of a will which

he executed under the forms required by law, "for when the capacity of a testator is perfect, his knowledge of the contents of his will is presumed from the fact of execution." The same rule has been held in cases of wills made by persons blind or illiterate, where the will was not written by a person taking benefits under it, was not contrary to the natural affections which a testator similarly situated would likely entertain, and when circumstances casting suspicion upon it are not shown. (Hemphill v. Hemphill, 2 Devereaux, 291; King v. Kinsey, 74 North Carolina, 261.)

In the case before us the paper claimed to be the will of Kelly was written by the person who under it would take one-half of his estate, which seems to be considerable, though at the suggestion of one of the persons who subsequently became a subscribing witness, it was copied by another person. The deceased was incapable of ascertaining its contents by inspecting it; and it is an unnatural will in that it gives all of his estate to strangers to his blood and ignores the claims which children have on parental affection, however much they may have wandered from a correct course of life.

In such a case we are of the opinion that it should be shown that the testator correctly understood the contents of the paper which he signed, and that the mere formal proof of the execution of the paper is not enough to entitle it to probate. (Hallison v. Rowan, 3 Washburn, 385; Beall v. Mann, 5 Georgia, 469; Harris v. Harris, 53 Georgia, 683; Rollwagen v. Rollwagen, 63 New York, 517; Wheeler v. Alderson, 3 Hagg, 574; Billinghurst v. Vickers, 1 Phillimore, 187, 199; Paske v. Ollat, 2 Phillimore, 323; Schouler's Executors, 75; Williams on Executors, 23; 3 Redfield on Wills, 47; 1 Redfield on Wills, 529.)

This case comes before us surrounded with facts which call for clear proof that Kelly knew the contents of the paper offered for probate. Deceased was in poor health; he was surrounded by those who claim benefit under it; it is not shown that he gave any instructions in regard to a will; it was written by one who was deeply interested in having such a will made; the making of it was kept secret from his only living child, though she seems to have been in the same house; one taking under it (in part at least) suggested who should be present at its execution; and it is unnatural in that it denies to those most nearly related to the deceased, any part of his estate, and was executed by one

not in possession of means within himself to ascertain its contents.

Was the clear proof which ought to be made in such a case that the deceased knew the contents of the paper furnished by the evidence? If he had that knowledge, witnesses testified in the case who could have shown it. The subscribing witness to whom the will was shown by the person who wrote it, evidently read it, or he never would have made the suggestion that it would be better for it to be in the handwriting of some person other than the person who wrote it and was to take benefits under it. He states that he heard the paper read which was read to the deceased, and, as before said, less than six lines of it disposed of an entire estate. The witness, who must have known the contents of the paper as read to the deceased, does not state that the instrument of which probate is sought was read, or correctly read, to the deceased. His statement is: "Mr. Settegast pulled out a paper and read it to him. I was standing by and heard it read, and knew it to be the wording of a will." This may all be true, and still the paper offered for probate never read to the deceased.

As has been well said, the law does not presume fraud, but when circumstances throw suspicion on a paper offered for probate, it does require clear proof.

Whether, after the paper was signed, the deceased declared, "It is all right, George," or inquired, "Is it all right, George?" the reply made by the witness would seem to give the best answer. It is neither necessary nor desirable further to comment on the evidence. The utmost good faith and fairness may have attended the entire transaction, and the paper offered for probate may be one very correctly understood by the deceased, and reflect in every particular his wishes; but this has not, in our opinion, been shown to be true in that clear and satisfactory manner in which it ought to be shown under the facts attending the execution of the instrument. If it be true that the deceased signed the paper, knowing its contents, those who offer it for probate show that they have the means to prove it, and they must be required to do so.

A new trial should have been granted, and for the refusal of the court to do so its judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered January 18, 1887.