**GULF OIL CORPORATION, Appellant,**

**v.**

**A. B. WALKER et al., Appellees.**

**No. 5099.**

Court of Civil Appeals of Texas.

Beaumont.

Feb. 20, 1956.

Rehearing Denied March 14, 1956.

174

. Luther C. Johnston, James R. Paxton, Palestine, Wm. S. Clarke, Gene Presley, Fred A. Lange, Houston, for appellant. .

Jones, Brian & Jones, Marshall, B. R. Reeves, Palestine, for appellees.

R. L. MURRAY, Chief Justice.

On March 1, 1954, A. B. Walker and C. B. Walker filed suit in the District Court of Anderson County, Cause No. 25,946, against Gulf Oil Corporation, John Caldwell, H. C. Caldwell, Booker T. Caldwell, Hettie Caldwell and J. Z. Werby alleging in substance that they are the two sons of Lillie Bell Walker, deceased, who with John Caldwell and Harrison (H. C.) Caldwell were the three children of George Caldwell, who died October 5, 1949, that on or about January 22, 1947, George Caldwell executed a deed to Booker T. Caldwell et al., recorded in Vol. 384, pages 122 and 123 of the Deed Records of Anderson County, purporting to convey to the defendants therein (except Gulf Oil Corporation and J. Z. Werby) 160 acres of land out of the William Gibson and S. C. Condray Surveys; that at the time of the execution of said deed George Caldwell was of unsound mind, unable to determine the consequences of his acts and did not possess the mental capacity to execute a valid deed; that the said deed should be set aside and held for naught with the result that George Caldwell died intestate as to the land covered by said deed, and plaintiffs therein as heirs at law of George Caldwell and Lillie Caldwell Walker, both deceased, do have and recover a one-third undivided interest in said land.

Gulf Oil Corporation claims the determinable fee estate in the oil, gas and other minerals under the said 160 acres of land under an oil, gas and mineral lease executed .

by Harrison (H. C.) Caldwell and John Caldwell and by Booker T. Caldwell and Hettie Caldwell, children of John Caldwell.

Gulf Oil Corporation discovered an instrument, dated October 1, 1927, which date was approximately 20 years before the date of the aforesaid deed being attacked by A. B. Walker and C. P. Walker in said Cause No. 25,946, and which instrument purported to be the last will and testament of George Caldwell, deceased, and on May 25, 1954, Gulf Oil Corporation, as proponent, filed its application in the County Court of Anderson County, Texas, to probate said instrument as the last will and testament of George Caldwell, as a muniment of the title of Gulf Oil Corporation to the said 160 acres of land in the Gibson and Condray Surveys.

A. B. Walker and C. P. Walker, plaintiffs in said Cause No. 25,946, filed a contest to the application of Gulf Oil Corporation to probate the will of George Caldwell and on June 7, 1954, after due hearing the County Court of Anderson County, Texas, entered its order admitting the instrument dated October 1, 1927, to probate as the last will and testament of George Caldwell, deceased, as a muniment of title.

The contestants, A. B. Walker and C. P. Walker, perfected an appeal from the order of the County Court probating the said will of George Caldwell, deceased, to the District Court of Anderson County, Texas, 87th Judicial District, where the cause was tried to a jury, said trial being commenced on November 8, 1954, and concluded on November 12, 1954.

At the close of the testimony, Gulf Oil Corporation duly filed its motion for an instructed verdict admitting to probate, as the last will and testament of George Caldwell, deceased, the instrument dated October 1, 1927. This motion for instructed verdict was denied by the trial court.

The cause was submitted to the jury on special issues which together with the answers of the jury thereto are as follows:

"Special Issue No. One–A. Do you find from a preponderance of the evidence that the instrument dated October 1, 1927, and purporting to be the last will and testament of George Caldwell, was signed by John Caldwell at the request of or under the direction of and in the presence of his father, George Caldwell, the testator?

"Answer 'Yes' or 'No'.

"Answer: 'No.' "

"Special Issue No. One. Do you find from a preponderance of the evidence that George Caldwell had testamentary capacity on October 1, 1927, at the time he executed the purported will in controversy, if he did execute said purported will?

"Answer 'Yes' or 'No'.

"Answer: 'No'.

"Special Issue No. Two. Do you find from a preponderance of the evidence that the execution of the instruments dated October 1, 1927, and purporting to be the last will and testament of George Caldwell, was procured through undue influence exerted upon George Caldwell by John Caldwell?

"Answer 'Yes' or 'No'.

"Answer: 'No.' "

"Special Issue No. Three. Do you find from a preponderance of the evidence that the instrument dated October 1, 1927, and purporting to be the last will and testament of George Caldwell, is a forgery?

"Answer 'Yes' or 'No'.

"Answer: 'Yes'."

"Special Issue No. Four. Do you find from a preponderance of the evidence that at the time George Caldwell executed the will in question, (if he did execute it), he did not know the provisions and contents of said will?

"Answer 'he did not know' or 'he did know.'

"Answer: 'He did not know.' "

Gulf Oil Corporation, on December 2, 1954, duly filed its motion for judgment non

obstante veredicto and alternate motion to disregard certain findings of the jury in response to Special Issues.

Upon hearing of said motion and alternative motion the trial court denied the motion of Gulf Oil Corporation for judgment non obstante veredicto stating that the court was of the opinion and found that each and every matter of fact and law alleged in said motion is proven by the undisputed and uncontroverted evidence, except the allegations bearing on the issue of testamentary capacity and the finding of the jury in response to Special Issue No. One, set forth above, relative to the testamentary capacity but was of the opinion that there was some evidence to support the answer of the jury to said Special Issue No. One.

However, the trial court further found that the alternative motion to disregard certain findings of the jury in response to Special Issues should be sustained and granted in so far as same requests the court to disregard the answers of the jury in response to Special Issue No. One–A (the instrument dated October 1, 1927, was not signed by John Caldwell at the request of and under the direction of and in the presence of his father, George Caldwell), Special Issue No. Three (that the instrument dated October 1, 1927, and purporting to be the last will of George Caldwell, was a forgery), and Special Issue No. Four (George Caldwell did not know, at the time he executed the will in question, the provisions and contents of said will), for the reason that the court was of the opinion and found that there was no evidence to support the jury's answers to said Special Issues Nos. One–A, Three and Four.

The trial court entered its judgment denying probate of the purported will of George Caldwell upon the answer of the jury to Special Issue No. One to the effect that George Caldwell lacked testamentary capacity to execute a will on October 1, 1927.

Gulf Oil Corporation duly filed its motion for new trial and included as grounds therefor that the jury was guilty of misconduct, which allegations were based upon affidavits of six of the jurors attached as exhibits to the motion for new trial, in that the jurors, before answering the special issues, discussed among themselves what they considered would be a verdict, i. e., whether or not the will should be probated, and during such discussion members of the jury expressed themselves as feeling that George Caldwell's two grandsons, A. B. Walker and C. P. Walker, the contestants, should get their part of their grandfather's estate; and the jury agreed to and did answer the special issues in such a way that the will would not be probated, etc.

The trial court heard testimony upon the allegations of misconduct of the jury which has been transcribed and designated as Statement of Facts, hearing on motion for new trial and filed in this cause and heard the other assignments of error, and on March 7, 1955, overruled the motion for new trial.

Gulf Oil Corporation has perfected its appeal to the Galveston Court of Civil Appeals, and the case was transferred to this court by an order of the Supreme Court.

Appellant brings this appeal under nine Points of Error, which points are as follows:

### First Point

The trial court erred in overruling proponent's motion for instructed verdict, proponent's motion for judgment non obstante veredicto and proponent's motion to disregard the jury's answer to Special Issue No. One and in failing to enter judgment admitting to probate the will of George Caldwell, deceased, dated October 1, 1927, because the undisputed and uncontradicted evidence shows conclusively, as a matter of law, that George Caldwell had testamentary capacity to execute said will and there is no evidence of probative force in the record to raise the issue of lack of testamentary capacity or to support the findings of the jury to Special Issue No. One, that George Caldwell did not have testamentary capacity on October 1, 1927.

## Second Point

The verdict of the jury in answer to Special Issue No. One is so against the great weight and preponderance of the evidence as to the testamentary capacity of George Caldwell as to clearly have resulted from passion or prejudice or other improper motive on the part of the jury and cannot be allowed to control the disposition of this cause, and the trial court erred in refusing to set aside such verdict and declare a new trial.

## Third Point

Proponent requested the trial court to instruct the jury that a belief in a state of facts which no rational person would believe ("insane delusion") is not sufficient to show testamentary incapacity to make a will unless such unfounded belief be related to the decedent's property or the object of his bounty and actually influenced the testator to dispose of his property in a manner other than he would have done but for such unfounded belief, and the trial court erred in refusing to give such requested instruction.

## Fourth Point

After proponent had presented its main case and contestants had closed their case and proponent had closed its rebuttal, the trial court permitted contestants to reopen their case and present the testimony of two witnesses, which testimony was available to contestants at all times before contestants had closed their case and was not in rebuttal of any new matter presented by proponent in its rebuttal. This action of the trial court over proponent's objection was in error as it deprived proponent of its valuable and substantial right to close the evidence.

## Fifth Point

The jury was shown to have been guilty of misconduct and to have given its answer to Special Issue No. One, to the effect that George Caldwell lacked the requisite mental capacity to execute the will dated October 1, 1927, as a result of passion, prejudice, agreement to answer the Special Issues in such manner as to prevent probate of the said will and the trial court erred in not setting aside the verdict and declaring a new trial.

## Sixth Point

Subject to Fourth Point above, the trial court erred in excluding a question propounded to Dr. Charles Castner and the answer of Dr. Castner thereto appearing in the deposition of Dr. Castner, because said testimony is material, relevant and competent as testimony of Dr. Castner which destroys any inference raised by Dr. Castner's answers to questions propounded by appellees that George Caldwell was a schizophrenic and was of unsound mind and which established that in the expert opinion of Dr. Castner, George Caldwell was at most a superstitious and eccentric person.

## Seventh Point

Subject to Fourth Point above, the trial court erred in excluding certain other questions propounded to the witness Dr. Charles W. Castner and the answers of Dr. Castner thereto appearing in the deposition of Dr. Castner, because said testimony is material, relevant and competent as testimony of Dr. Castner which destroys any possible inference, raised by Dr. Castner's answers to questions propounded by appellees that George Caldwell was a schizophrenic and was of unsound mind and which established that in the expert opinion of Dr. Castner, George Caldwell was at most a superstitious and eccentric person.

## Eighth Point

Subject to Fourth Point above, the trial court erred in excluding certain other questions propounded to Dr. Charles W. Castner and Dr. Castner's answers thereto appearing in the deposition of Dr. Castner because said testimony is material, relevant and competent as testimony of Dr. Castner which destroys any possible inference, raised by Dr. Castner's answers to questions propounded by appellees that George Caldwell was a schizophrenic and was of unsound mind and which established that in

the expert opinion of Dr. Castner, George Caldwell was at most a superstitious and eccentric person.

### Ninth Point

Subject to Fourth Point above, the trial court erred in excluding certain other questions propounded to Dr. Charles Castner and Dr. Castner's answers thereto appearing in the deposition of Dr. Castner because same were material, relevant and competent as testimony of Dr. Castner which established that in Dr. Castner's expert opinion schizoid or schizophrenic symptoms or traits generally when coupled with traits and actions exhibited by George Caldwell would not affect the judgment or the ability of George Caldwell to evaluate nor be evidence of unsound mind.

The appellees challenge all of appellant's Points of Error by appropriate counterpoints, and also present two cross-assignments of error. These are as follows:

### Appellees' Cross-Assignment One.

The trial court erred in concluding there was no testimony to support the findings of the jury on Special Issue 4, to the effect that George Caldwell did not know the provisions and contents of the purported will offered for probate.

### Appellees' Cross-Assignment Two.

The trial court erred in concluding there was no testimony to support the findings of the jury on Special Issues 1-A and 3 to the effect that the purported will of George Caldwell was not signed at his request or under his direction, but was a forgery.

We consider first appellant's Points 1 and 2, which attack the sufficiency of the evidence to support the jury's verdict of lack of testamentary capacity. The appellant says that the undisputed and uncontradicted evidence shows conclusively, as a matter of law, that George Caldwell did have testamentary capacity to execute the will and that there is no evidence of probative force to raise the issue or to support the jury's findings that George Caldwell did not have testamentary capacity. It also contends that even if there was any evidence to support such jury findings, the verdict is so against the great weight and preponderance of the evidence as to have resulted in passion or prejudice or other improper motive. In passing upon these two points it was necessary to read the entire statement of facts, which consists of almost 900 pages. After reading the statement of facts and after a study of the careful and extensive briefs of both parties, and the reading again of many portions of the statement of facts, we are satisfied that the evidence is sufficient to raise the issue and support the findings of the jury as to lack of testamentary capacity.

George Caldwell was born in 1859 and died in 1949 at the age of 89 years. He was about 68 years old in 1927 at the time of execution of the contested will. He was an illiterate farm negro, born in slavery, and lived near Neches in Anderson County practically all of his life. His first wife was Lucy Caldwell; their three children were Lucy, John and Harrison Caldwell. George and Lucy separated in 1888 and she moved to Palestine, taking the three children with her. After a short while the two boys went back to the farm to live with their father and Lucy lived with her mother. Lucy's two sons, A. B. Walker and C. P. Walker, grandsons of George Caldwell, were the plaintiffs in the suit filed to attack the validity of George Caldwell's deed mentioned earlier in the statement above in this opinion, and they are the contestants of the probate of the will offered for probate by appellant Gulf Oil Corporation. John Caldwell was present at the time the contested will was executed and testified at the trial. John was the one who went to a lawyer and had the will prepared and typewritten. He testified that his father told him what he wanted in the will and he told the lawyer that. He was present with the two attesting witnesses to the will when his father signed the will by mark. He said he was the one who wrote his father's name at his father's request and made the mark on the will, told his father to touch the pen and he did so. After the will was executed, John kept it

in a box with his own private papers for over twenty years until a suit was filed to set aside a deed his father had made to his property. The will devised to John and Harrison, George's two sons, all his land, and made John independent executor. The two grandsons, the contestants, were not named as beneficiaries in the will.

The appellees first introduced in evidence a copy of lunacy proceedings to show that Lillie Bell Walker, daughter of George Caldwell and mother of the contestants, had been adjudged to be non compos mentis in Bexar County in 1914. Also in evidence was a statement of the testimony in the lunacy proceedings by Lucy Caldwell to the lunacy commission. She stated that Lillie Bell Walker was of unsound mind, that she had various delusions, wandered from home and was hard to control; that her insanity was hereditary, that her father and grandfather were also so affected and that Lillie once attempted suicide with a knife. The report of the doctors in that case was that Lillie was of unsound mind; that she should be treated and placed under restraint, that her condition was described as "maniac-depressive"; that insanity is hereditary in her family. The contestants then introduced in evidence testimony of A. B. Walker, H. H. Hassell, Tom Furnish, Fletcher Williams, Annie Moore, John Edgeworth, Preston Hassell, Mrs. Robert Hassell, L. B. Gorman, George J. Lacy, whose testimony covers about 200 pages in the statement of facts. They related a long acquaintance with and observation of George Caldwell during his lifetime over a long period of years. They told of various peculiarities, beliefs, delusions, actions and deportment on the part of George, based upon which they testified that he was of unsound mind. Many people in the community where he lived, particularly the children of that community, referred to him as "Crazy George". He made a trade with one Yates, a witness for proponents of the will, in which George was to pick peas on Yates' land, whereas Yates was willing to make an agreement that George should get half and Yates should get half of the peas; George wanted it another way; that is, he wanted a third to himself and two-thirds to Yates. At other times he became confused while making purchases at the country grocery store and would buy at different times in the course of his purchases four sacks of tobacco, apparently forgetting that he had already bought other sacks; he was afraid of banks and kept his money at home and on one occasion hid a considerable sum of money in a bale of cotton and then sold the bale of cotton. He did later remember where his money was, however, and retrieved it from the bale of cotton. He did not know how many cattle he owned and might recognize some but not all of them. He would not know how to buy a piece of land or how to pay for it if he had the money. He would not know if he had money in the bank. He couldn't figure; he couldn't weigh cotton; he was unable to talk sense about cattle, usually getting off the subject and beginning to talk about the devil. He sometimes would create a disturbance in his house and explain it by saying he was having a fight with the devil. He believed he died and had physically gone to both heaven and hell, and while in these places he had talked with the devil, imps, demons and angels; that while in hell he had seen the devil making candy out of plow points; that hell was black and heaven was a pretty place; that while in hell he had heard the devil playing a tune on a fiddle and that he could sing this tune; that he had been to heaven more than once; that he saw streets made of gold and sawmills and good timber; that while in hell he had seen the devil sawing up people with a circular saw and throwing them into a lake of fire; he had seen the devil's horse, which was so big it had one foot in St. Louis and the other in California. George usually refused to cross any bridge and sometimes gave the reason that there were devils under them; he believed God was unable to kill him for twenty years. George beat on stumps, believing they were the devil's home and that he must drive the devil out by beating on them. He shooed back demons away from fences when he crossed them; he locked and unlocked an imaginary gate in front of his home to keep people from stealing from him. He believed that

at 4 o'clock on Sunday he had to hitch up his two horses, Monk and Eula, to the moon and pull the moon half way up so it would slide on down; that the angels were teaching him a song and when he would try to sing it he would utter "some kind of a racket". Sometimes in singing this song he would begin frothing at the mouth. When George would attempt to join in the singing at the church he would sing "random" and wouldn't sing like the other folks; sometimes at church he would curse and say that what the preacher said was a damn lie. He believed he saw the devil in church sitting over in the corner. George could not long retain in his mind one train of thought and would begin talking about one matter and break off and go off to another subject far afield. He felt that he had a spirit named "Monk" who would tell him a short time prior to his death when he was going to die so he could dispose of his property. When L. B. Gorman's mother-in-law was sick George was present and after watching her for sometime he left hurriedly, explaining to others that black demons and devils were crawling under her bed and that "she will be gone directly." At one time while cutting wood with a companion George suddenly darted away and left him and explained later that he did so because he saw his companion's sick friend, one Jeter, with a long tail hanging down behind him. Jeter was sick at the time of the wood cutting and died a few days afterwards. He believed he could converse with the Lord, the devil and the saints; that he could foretell the future.

■ Of course, there was a large amount of testimony before the jury to the effect that George Caldwell, while eccentric at times, was nevertheless of sound mind with good business judgment, and able to care for himself and his property and make a will disposing of it. It is useless to recite the many authorities which hold that in case of a conflict in the evidence it is the duty of the jury to resolve such conflicts. Appellate courts have nothing to do with the question of preponderance of the evidence, and are only authorized to set aside the verdict of a jury where the evidence so wholly and overwhelmingly preponderates against the verdict as to show that the jury was actuated by passion or prejudice, or some other improper motive, and that the verdict is clearly wrong. We think the evidence by the witnesses that George Caldwell was of unsound mind, based upon the conduct and actions which they had observed in him, was sufficient to support the jury's verdict.

■ The appellant in its brief presents a number of authorities in support of its contention that even though the evidence may have shown that George entertained delusions, nevertheless there is nothing in the evidence to show that the execution of the will offered for probate was in anyway actuated by or found its source in any of such delusions. It argues that since this is true, there was no evidence, or insufficient evidence, to warrant and support the jury's finding of lack of testamentary capacity. Appellant's general proposition is correct. The general rule is that where general insanity is not shown, but only some specific insane delusion or monomania, the will is valid unless the terms of it appear to have been directly influenced by the infirmity. The mental error must have been actually operative in the production of the instrument. 175 A.L.R. 956; Prather v. McClelland, 76 Tex. 574, 13 S.W. 543; Bagwell v. Shanks, Tex.Civ.App., 260 S.W. 222; Denson v. Beazley, 34 Tex. 191. "A man may believe himself to be the supreme ruler of the universe and nevertheless make a perfectly sensible disposition of his property, and the courts will sustain it when it appears that his mania did not dictate its provisions." This is the language of Judge Cooley in Fraser v. Jennison, 42 Mich. 206, 3 N.W. 882, 900.

■ We believe that the evidence in the instant case goes beyond a mere showing that George Caldwell at times had insane delusions, and shows evidence of an unsound mind generally. Where there is evidence of an unsound mind incapable of knowing and understanding the effects of his act in making a will, knowing the objects of his bounty and their claims upon him and the general nature and extent of

his property, then it is not necessary that the evidence show that any particular insane delusion was directly operative as a producing cause of the will. See Peareson v. McNabb, Tex.Civ.App., 190 S.W.2d 402; Breeding v. Naler, Tex.Civ.App., 120 S.W. 2d 888; Walston v. Mabry, Tex.Civ.App., 225 S.W.2d 1014.

We believe that all of the evidence taken together, including that of the witnesses who observed the behavior and heard the statements of George Caldwell, and the manner and method of the actual execution of the will itself and of the surrounding circumstances thereof, are sufficient to support the verdict of the jury and Points 1 and 2 are overruled.

Under its Point 3 the appellant complains of the trial court's action in refusing to give the following instructions to the jury, as requested by the appellant:

"You are further instructed in connection with the term 'insane delusions' as used in connection with the execution of wills, and for your guidance in this case, that a belief by testator of a state of supposed facts which no rational person would believe is not sufficient to show testamentary incapacity to make a will unless such unfounded belief be related to the decedent's property or object of his bounty."

"You are further instructed in connection with the term 'Insane Delusions' as used in connection with the execution of wills, and for your guidance in this case, it is necessary that the belief of a state of supposed facts which no rational person would believe must be such a belief in regard to or concerning the value and extent of the property of the testator, the next of kin, the natural objects of testator's bounty or the beneficiaries under the will, because of such a belief, being unrelated to the decedent's property or objects of his bounty could not affect the validity of the will."

The court actually gave the following instructions:

"To make a valid will, the person making the will must have testamentary capacity, and must not, at the time of the execution of the will, be laboring under an insane delusion, which influences the person executing such will to dispose of his property in a way which he would not have disposed of it but for the insane delusion; and the person making the will must not (at the time of making the will) be laboring under undue influence exerted upon him by some other person of persons.

"You are further instructed in connection with the term 'testamentary capacity' that a person, to have testamentary capacity, as that term is used in connection with the execution of wills and for your guidance in this case, is meant that such person at the time of the execution of the will, must have had sufficient mental ability to understand the business in which he was engaged, the effect of his act in making the will, and the nature and extent of his property; he must be able to know his next of kin and the natural objects of his bounty and their claims upon him; he must have memory sufficient to collect in his mind the elements of the business about to be transacted and to hold them long enough to perceive at least their obvious relation to each other and be able to form a reasonable judgment as to them.

"You are further instructed in connection with the term 'insane delusion' as used in connection with the execution of wills and for your guidance in this case means the belief of a state of supposed facts which no rational person would believe."

█ It appears to us in examining the instructions actually given by the court in its charge and the two instructions requested, that the trial court included substantially everything contained in the requested definitions. In Peareson v. McNabb, cited above, this same charge and definition were given by the court and were approved. Insane delusions of the testatrix constituted

an issue in that case. The trial court was not required to submit the requested issues and instructions, since they were sufficiently covered by the court's definition and issues in the charge given. See Thomas v. Billingsley, Tex.Civ.App., 173 S.W.2d 199. This point is overruled.

■■ By its fourth point the appellant complains of the trial court's action in permitting the appellees, contestants in the trial court, to introduce evidence after the appellant had presented its main case and rested, the contestants had introduced evidence and rested, and after the appellant had introduced further evidence in rebuttal and closed its case.. It says that this action of the court violated its right to open and conclude the case as to introducing evidence, in violation of Rule 266, Texas Rules of Civil Procedure. We find no merit in this contention. The appellant was nowhere and at no time denied the right to introduce any further evidence it might have had when the appellees concluded their evidence. We think that it has long been settled that it is a matter addressed to the discretion of the trial court whether any party to a suit should be permitted to introduce additional evidence, even after both sides have finally rested their case. In Mahan v. Wolf, in 61 Tex. 488, the holding disposes of the appellant's contention. Speaking of the court rule then in effect in regard to opening and closing the evidence, the court said, "It gives the plaintiff the right to open and conclude the evidence, unless the defendant enters certain admissions of record. But it does not thereby give him the privilege of stopping the case at any state of the proceedings he may choose, by merely declining to offer proof, and thus deprive the defendant of valuable evidence which he is entitled to introduce under the rules of law. The plaintiff might still have enjoyed the privilege after the evidence objected to had been heard if she had other proof to offer, and neither the defendant nor the court proposed to deprive her of that right." This point is without merit and it is overruled.

Appellant's fifth point complains of jury misconduct and the appellant says that the trial court erred in overruling its motion for new trial, based on the evidence it presented on the hearing on its motion. Six of the members of the jury testified on the hearing. Five other jurors were summoned and were in attendance but did not testify. All of them testified that there was some discussion or talk back and forth among the jurors before they actually began voting on the various issues, and there were some who remembered that it was said that the grandsons should get part of their mother's estate and others remembered it being said that the will ought to be probated; others that it should not be; others that if the will was probated the grandsons wouldn't get their part. The evidence discloses no verbal agreement by the members of the jury to answer the issues in such a way that the grandchildren would get their part of their mother's estate. Some of the jurors testified that they recalled that one of the attorneys for the appellant, on the voir dire examination of all the jurors, asked the jury if they had any objection against the law which allowed a man to make a will and cut out some of his heirs; that under the laws of descent and distribution the property over which this suit was to be tried would go to the testator's heirs. One of them testified that he remembered the closing part of the argument by one of counsel for the appellant to the jury in which he told them that he felt that "this jury will do their duty and uphold this will of this grand old negro, and probate this will as the proponents have asked that it be probated here in this courthouse in Anderson County, I thank you." There was other testimony from the foreman and others that they took up each issue one at a time and discussed the evidence.

■■ The appellant had taken affidavits of several members of the jury and attached them to its motion for new trial. Statements of these affidavits went a great deal further in discussing and revealing improper statements made in the jury room. These affidavits, however, could not be used for the purpose of establishing the facts therein contained.. They could at most be considered as impeaching the testimony of each

individual witness given on the hearing. The evidence adduced on the hearing presented at most a question of fact as to whether matters set out in the appellant's motion were true, and the trial court by its action in overruling the motion made the equivalent of a fact finding that such matters alleged did not occur. The trial court's action in passing on the evidence is as binding upon a reviewing court as is the finding of a jury on evidence which is conflicting. Bradley v. Texas & P. Railway Co., Tex.Com.App., 1 S.W.2d 861.

■■■ It was, we believe, not misconduct on the part of the jury to mention and discuss probating the will of George Caldwell. Certainly everyone who heard any considerable portion of the trial must have known that the appellant was trying to have the will accepted for probate and the contestants were endeavoring to prevent such a result by their evidence that George Caldwell did not have testamentary capacity. Counsel had argued to the jury that they should probate the will. Under all of the circumstances, no misconduct as a matter of law is shown by the evidence adduced on the hearing and the trial court did not err in overruling the motion for new trial. This point is overruled.

Under its Points 6, 7, 8, and 9 appellant complains of the trial court's action in excluding from the evidence certain questions propounded to Dr. Castner and his answers thereto. Dr. Castner's evidence was in the form of a deposition. The appellees read in evidence certain selected portions from Dr. Castner's deposition, and the appellant thereafter attempted to introduce certain other questions and answers from Dr. Castner's deposition for the purpose of showing that Dr. Castner had refuted, by such answers, any inference as to the testamentary incapacity of George Caldwell which might result from his answers to hypothetical questions introduced by the appellees. When the appellant attempted to introduce the questions and answers from the deposition, appellees made the objection that they were hypothetical questions which assumed facts not in the evidence and did not include all of the facts in evidence. Counsel for appellant at the close of his examination of Dr. Castner asked the following questions and received the answers indicated: "Q. Doctor, I have just a few more questions here. I want to find out a little bit more about these delusions, as you have been talking about, and as I recall you said that was mistake of the fact as it exists? A. Yes, that's right. It is not that way, a false belief. Q. Now, I want to try and find out just what this thing is. Now, assume that we have a small child and I hold up a piece of black paper and over a series of days, weeks I say, 'son, this is white' and he thereafter, someone comes in and holds up a piece of black paper and says, 'son, what color is this?' And he says, 'white'. Would that be classified as delusions? A. No, that is the result of training. That is a fixed pattern as a result of training."

The following questions and answers were the excluded portions of Dr. Castner's deposition of which the appellant complains:

"Q. We say that is a result of training. Assuming that this man could neither read nor write; now, assume that he was told when he was very young, that he had died and had been laid out on a cooling board, and had come back to life, and of course, presume—you are presuming then of course, that he goes to church, he can't read and write, he has no way of finding out these facts for himself, so, he listens to the preacher. Now, if the preacher preached, and I am sure we have all heard them preach about the devil is among us, and the devil is on every hand, the devil is behind you. If you read the Bible where it says, 'get thee behind me Satan,' where Christ was supposed to have told the devil on the mountain top 'Get thee behind me Satan,' and you have the other story you hear in church. I am sure you have heard some of it. Now, we have also religious books that, I am sure all of us have seen some of those, that have pictures, where you have the devil standing among distorted human figures with

a human figure on the end of a pitchfork, getting ready to cast him into the fire. · Assuming that each of these things that we are talking about, does it mean because he says those things that he has delusions, or could it mean that he has been told those things, and has been taught that, so that it would be no different to him, than that child who has been told that this black piece of paper is white, and when asked that it is, he says it is white. Now, could those things arise from the same situation? A. They could for this reason, that we do know, it has happened to me in my own experience, where we have people that we believe are dead, and tell them that. That happens in operating rooms, it happened on us. It has happened out in the homes, it has happened many places, where we really believe the patient is dead. They are not, and they go on and live afterward. Now, if it was a young fellow and that happened to him and somebody told him that, he may not remember it outright, and if, in later life, he associates some of the things he hears back to this thing that was told him, it might be somewhat in the same category. If he was told that. Now, if a man, just of his own formulation stated that he had died and laid out, and all during that time he had certain visitations at different places, I think that is a little different category as the question covered, as the circumstances covered in your question. * * *

"Q. Now, just assuming that same man did those things that were in that series of questions that were asked you just a minute ago, and these things occurred occasionally, people might have seen or heard these things occasionally; but at the same time, this individual has a period of 40 or 50 years of successful farming, business, trading, selling cotton, buying cotton, buying land, getting along financially, as we say, a good trader, a good negotiator, and always able to hold his own with more

educated people. He is a man that can't even read nor write, would you say that would be a true schizophrenic, as we are talking about, but the person who had along with some of these that we repeated, which you might say, were delusions, but at the same time he had been able to trade, sell cotton, buy cotton and do all kinds of trading with lands and cattle and so forth, and make good trades, and not be taken in, would you say that man * * * these things indicate or prove definitely the man is a true schizophrenic? A. No, I wouldn't say he would be a true any abnormality. Because he might have a belief about something that happened to him earlier in life, and may still repeat those experiences, might not influence his ability to make a living and get along in the community, if it didn't render him anti-socially."

"Q. He could have each one of those things that you talk about, or he could have all of them, that were set forth in those questions, those delusions or those peculiarities? A. Yes, he could have all of those peculiarities. If those peculiarities didn't render him anti-socially in the community, and went along as a successful citizen, trading and buying and all of that, I wouldn't want to say that I would be persuaded to believe that those things incapacitated him for doing those things."

"Q. Yes, sir, I just want to find out for sure, you are not saying that a schizophrenic or a person with these schizophrenic tendencies or symptoms that we have talked about, that wouldn't necessarily render him incapable of taking care of his business affairs, and knowing his property and understanding the results of his acts in a business way? A. No, not what we have gone over here would not do so. I wouldn't say that it would be."

Before discussing the trial court's action in excluding the above questions and an-

swers we note that Dr. Castner was permitted to answer additional questions by counsel of appellant.

"Q. Now, doctor, assuming that this man did not become antisocial; that he went to church; that he went to the store to purchase his supplies once or twice a week; that he worked at a sawmill; that he saw his children occasionally and his grandchildren; and picked cotton for his neighbors and things like that; would that also tend to show that he was not a schizophrenic? A. Well, he certainly wouldn't have schizophrenic predominating to the point that would make him antisocial and not be able to get along in the community.

"Q. You do feel that a man who had religion falsely interpreted to him, I won't say falsely interpreted, I can't say what the preacher says is false, say if he did have those pictures from the preacher about certain religious things, angels, devils, the pearly gates or anything alse, if that had been taught to him, those things of themselves would give you more of an indication like the education rather than a personality complex, wouldn't it? A. If those things were taught him when he was a child or young boy, after he grew up and his life experiences did not disabuse his mind, maybe of the falseness of some of it, if that lived on with him, it might become a disturbing factor in his personality. It might lead to some mental abnormality. Now, I wouldn't be able to just put my finger on it, or what that would be, because it could develop into a delusion that he might not be turning aloose of. He got it when he was a young fellow and he just holds on to it, and he might still have it. It might not, I have seen some persons where it didn't; that they held on to some of these ideas that were taught them when they were young about the history of the Bible and things that were represented there, but it didn't incapacitate them for getting along and adjusting themselves in the community; they may be considered as a religious crank; however, they went on and did pretty good, they made a good living, and I have known some of them that were pretty keen.

"Q. Take this this way, would you say because a granddaughter exhibited certain schizophrenic tendencies, that, would you say that would necessarily indicate that the grandfather, probably had schizophrenic tendencies? A. No, we wouldn't do that."

"Q. It does not go back? A. No, we don't reverse our * * *"

"Q. You would not attribute or attach any significance in determining a grandfather's condition by the mere fact that it was a granddaughter? A. No, if there were some mental abnormality back in the grandfather, they might have assumed an entirely different course or classification.

"Q. It could not be said because a grand-daughter exhibited certain schizophrenic tendencies that necessarily the grandfather must have done it? A. No, we don't ever run down any mental abnormalities in generations back."

He also testified in answer to questions by appellant's counsel in regard to senile degeneration of mind and testified that the average duration by the time the first symptoms appear to the time of a complete breakdown of the mind is five years; that a behavior pattern which continued for 50 or 60 or even 40 years going from an age from 40 to 90 years would not be classified as senility.

■■■ To return to a discussion of the court's action in excluding the questions and answers from the evidence, it appears to us that many of the matters contained as basic facts in appellant's questions to Dr. Castner were not actually in the evidence. Of course, this deposition was taken sometime prior to the actual trial itself, and we appreciate the difficulties under which counsel labored in preparing and asking hypothetical questions from an expert witness without the benefit of actual certainty in his mind of

what evidence would be in evidence at the time the deposition should be offered in evidence. He could at best assume that all things of which he hoped to make proof would be safely in the record by the time in the course of the trial, when he should offer his depositions. However, no matter how expert and careful the attorney may be, he still must assume the risk that some of the matters which he had hoped to prove might be excluded from the evidence by the trial court and that other portions would not develop from the witnesses who appear on the witness stand, or that some witnesses upon whose testimony he depended might not be present for the trial. At any rate, the appellees point out, in defending their objections to the hypothetical questions and the court's action in sustaining the objections, the following matters included in hypothetical questions which were not in evidence: "that George was 'told when he was very young' that he had died and been laid out on a cooling board and come back to life; that George, being unable to read and write, had no way of finding out these facts for himself, so he listened to the preacher, and if the preacher had preached about 'the devil is among us, and the devil is on every hand, the devil is behind us and if he read the bible where it said 'get thee behind me Satan', where Christ told the devil on the mountain top 'get thee behind me Satan,' and you have the other story you hear in church; that we also have religious books, counsel being sure that all of us have seen some of those that have pictures where the devil is standing among distorted human figures with a human figure on the end of a pitchfork, getting ready to cast him in the fire and that because George has been told those things and has been taught that, so that it would be no different to him than that child who has been told that this black piece of paper is white, could those things arise from this same situation?" Appellees point out that the appellant has not pointed out to us in his brief any place in the statement of facts where such recitals of the evidence may be found. We have made a rather careful examination of the whole record of the evidence and do not find these recitals in the evidence. The hypo-

thetical question therefore was subject to the objection made by the appellees and the court properly excluded them on objection. Hypothetical questions should be restricted to the facts in evidence, otherwise they will be misleading and confusing, and therefore prejudicial. Texas Employers' Insurance Ass'n v. Fitzgerald, Tex.Com.App., 296 S. W. 509.

■ It is apparent, also, that the questions in part (we refer now to the excluded hypothetical questions) contained a reference to a preceding question; the first question assumes that the man "did those things that was in that series of questions that were asked you a minute ago;" the second question also assumes that George Caldwell "could have had all of those things set forth in those questions." The third and fourth questions refer to "all those things we talked about" in preceding questions. Some of the questions which had been asked and answered in the deposition itself were excluded when offered at the trial, and portions of the hypothetical questions excluded and here complained of obviously referred to matters contained in those questions, which were not answered in the evidence. The answers of Dr. Castner to appellant's questions which were admitted in evidence showed that the doctor believed that George was not to be considered abnormal under the conditions set forth in the questions he answered. We overrule appellant's Points 6, 7, 8, and 9 and hold that the points show no reversible error, if error is shown.

The appellees' cross-assignment No. 1 maintains that the trial court erred in sustaining a portion of appellant's motion to disregard certain findings of the jury in its verdict. In particular it complains of the trial court's conclusions that there was no evidence to support the findings of the jury in answer to Special Issue No. 4, to the effect that George Caldwell did not know the provisions and contents of the will offered for probate. Brice McDonald, who is one of the attesting witnesses of the will offered for probate, testified that at the time when he witnessed the will he did

not read the will out loud nor was it read out loud in his presence. John Caldwell, the chief beneficiary under the will and independent executor named therein, was the one who testified that he had secured a lawyer to prepare the will and that he had made it as his father, George Caldwell, told him he wanted it. He described the proceedings at the time when he testified that his father executed the will by touching the pen while he, John, made the mark; that he signed his father's name to the will at his direction. We have again examined his testimony in detail and do not find anywhere that he testified that he or anyone else had read the will to George Caldwell before he touched the pen to make his mark, or at any other time, or that George knew what was contained in the will.

In Kelly v. Settegast, 68 Tex. 13, 2 S.W. 870, 873, 879, the following was written by the Supreme Court:

"In the case before us the paper claimed to be the will of Kelly was written by the person who under it would take one-half of his estate, which seems to be considerable, though, at the suggestion of one of the persons who subsequently became a subscribing witness, it was copied by another person. The deceased was incapable of ascertaining its contents by inspecting it, and it is an unnatural will in that it gives all of his estate to strangers to his blood, and ignores the claims which children have on parental affection, however much they may have wandered from a correct course of life. In such a case we are of the opinion that it should be shown that the testator correctly understood the contents of the paper which he signed, and that the mere formal proof of the execution of the paper is not enough to entitle it to probate. Harrison v. Rowan, 3 Wash. 585; Beall v. Mann, 5 Ga. 469; Harris v. Harris, 53 Ga. 683; Rollwagen v. Rollwagen, 63 N.Y. 517; Wheeler v. Alderson, 3 Hagg. 574; Billinghurst v. Vickers, 1 Phillim. 187, 199; Paske v. Ollat, 2 Phillim. 321; Schouler, Ex'rs, 75; Williams, Ex'rs, 23; 3 Redf. Wills, 47; 1 Redf. Wills, 529."

 The attesting witnesses testified in regard to the occasion when George Caldwell made his mark on the will. They were very vague as to what actually happened at that time, and one of them was doubtful that George was of sound mind. No one present at the occasion had made any inquiry as to whether George knew what was in the will and George, himself, did not make any statement that he did know what was in the will. The will after its purported execution was kept in the possession of John Caldwell. All of these circumstances in evidence support the appellees' contention that this feature of the case is governed by the holding in Kelly v. Settegast, supra, and that the jury was warranted in its finding that George Caldwell did not know the contents of the will offered for probate. We sustain appellees' cross-assignment No. 1 and hold that the jury's answer to Special Issue No. 4 was supported by the evidence or the lack of evidence, and such answer of the jury, in addition to the jury's answer to Special Issue No. 1, relating to testamentary capacity, is an additional ground for holding that the trial court's judgment was not erroneous in refusing to admit the will to probate.

 By their cross-assignment No. 2 the appellees contend that the trial court erred in concluding that there was no testimony to support the findings of the jury in answer to Special Issues 1–A and 3 to the effect that the purported will of George Caldwell was not signed at his request nor at his direction. On the trial the appellees introduced the testimony of an expert on questioned documents. He testified in regard to photographs of the purported signature and mark attached to the will. In the record are enlarged photographs of the signature and mark. The expert witness testified that in his opinion the mark between the words "George" and "Caldwell" is not in the form generally found to be used by illiterates in making such a mark; that the mark was made at a different time

188

from that when the name was written; that an illiterate person could not have made the mark nor could the pen have been touched before or after or during the time the mark was made. He gave his reasons for his conclusions. However, it is borne in mind that John Caldwell testified that he wrote the words "George Caldwell" at the direction of his father, that he made the mark and his father touched the pen while he did it. The expert's testimony could all be accepted as true and still it would not contradict the testimony of John Caldwell as to the manner in which the name was written and the mark made. In fact, the expert's opinion corroborates John, since he was a literate person who wrote the name and also made the mark. The testimony of Brice McDonald and John Caldwell was of such a nature that the testimony of the expert witness did not and could not serve to destroy it. We overrule appellees' second cross-assignment.

The judgment of the trial court denying probate of the purported will of George Caldwell, deceased, is affirmed.